(No. 70470.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT TODD, Appellant.

*Opinion filed December 4, 1992.—Rehearing denied February 1, 1993.*

58

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Robert Todd, was indicted on five counts of first degree murder. The defendant waived his right to a jury trial and Clinton County Circuit Judge Dennis Huber found the defendant guilty on all five counts. The defendant additionally waived his right to be sentenced by a jury, and the circuit court found that the defendant was eligible for the death penalty since the murder was committed while committing robbery and while attempting to commit aggravated criminal sexual assault. The circuit court found that the aggravating factors outweighed the mitigating factors and sentenced the defendant to death. Defendant took a direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1989, ch. 38, par. 9—1(i); 134 Ill. 2d Rules 603, 606.

## FACTS

At 11 a.m. on July 12, 1989, 14-year-old Natalie Shelton discovered the body of her mother, Sandy Shelton, in their home in Beckemeyer, Illinois. Noticing a strong odor of natural gas, Natalie went over to the stove and turned off all burners. Natalie also saw a container of vegetable oil on the floor in the living room and

several burning candles. Emergency paramedics arrived at the scene a few minutes later and found the victim's nude body lying face up between the living room and the bedroom. The emergency personnel also noticed a heavy concentration of gas in the home, as well as several burning candles.

Crime scene technician Alva Bush arrived at the victim's house at approximately 12:30 p.m. Bush inspected the victim's body and found that she was nude except for a green blouse tied around her neck that was intertwined with a necklace, two shoestrings tied to her right wrist, and a black watch on her left wrist. The victim had received injuries to the face and stab wounds to the chest. The body appeared to have a shiny, oily substance on it and the victim had small red droplets of wax spread over her body from the shoulders down. The technician also observed feces between the victim's legs, both on the floor and on her body. The victim's bra was lying near her right shoulder with a portion of the bra torn off lying north of the victim's head. East of the victim's feet were a pair of underpants and a pair of blue jeans that were turned inside out. One hundred dollars was found inside a jeans pocket. Bush further found a red candle and a Miller Lite beer can underneath a blanket which was partially covering the victim's left foot. Another can of Miller Lite was found on an ashtray table and a six-pack of Miller Lite with two cans missing was found in the victim's refrigerator.

A pathologist, Dr. Steven Nuernberger, performed an autopsy on Sandy Shelton on July 12, 1989. After removing the tightly wound blouse from the victim's neck, he noticed a linear depression where the blouse had been. He also noticed hemorrhaging to the muscles on either side of the neck, as well as hemorrhaging beneath the mucosa which reflected that the victim's trachea had

been crushed. In his autopsy report, Dr. Nuernberger listed strangulation as the primary cause of the death.

Dr. Nuernberger also noticed five stab wounds down the left side of the victim's body. Four of these stab wounds penetrated the victim's chest wall. One stab wound went through the victim's lung, diaphragm, and stomach and ultimately cut the inferior vena cava. According to Dr. Nuernberger, the stab wound to the inferior vena cava would prove fatal to most human beings. In his opinion, the stab wounds were caused by a sharp knife, and these wounds would be put in the category of "making sure the victim was dead." The small amount of blood present in the chest cavity and abdomen indicated to Dr. Nuernberger that the victim had been stabbed at the time of death or shortly thereafter.

Dr. Nuernberger also observed bruising and swelling around the victim's left eye, left lower lip, and cheekbone. There were also three subgaleal hemorrhages in the left and right temporal area of the skull which indicated blunt trauma to the victim's head. In his opinion, these head injuries were caused by a minimum of five separate blows to the head. Dr. Nuernberger also noted bruises or contusions on the victim's wrist, right clavicle, and the lateral top of her breast. The bruise to the wrist was consistent with someone's having grabbed the wrist very tightly, and the bruise to the chest indicated a blow to the chest. The victim had also received three superficial cuts across the abdomen which appeared to have been caused by a knife.

Dr. Nuernberger also testified that the fecal matter found on the victim's body indicated that she had been standing when she was suffocated. Upon examination of the wax droplets, he opined that their appearance indicated that they had been applied after death. Dr. Nuernberger also stated that the victim's blood-alcohol level had peaked at 0.48 during the evening, but had declined

to 0.35 at the time of her death. Finally, Dr. Nuern-berger indicated that the vaginal smears he took showed no identifiable presence of sperm, and he detected no evidence of trauma to the vagina or rectum. However, he further testified that such findings do not rule out the possibility that a sexual assault in fact occurred.

The following testimony was relevant to the victim's and defendant's activities on July 11 and July 12, 1989. At approximately 1 p.m. on July 11, the victim stopped in to visit her mother and showed her mother a black purse that she had just purchased. A bartender at the Sports Page Bar & Grill, Bruce Davis, testified that at about midnight the victim entered the bar, sat at the bar, ordered a Miller Lite, and paid for the beer with money she obtained from the purse that she was carrying. Shortly thereafter, the defendant entered the bar, sat down next to the victim, ordered a draft beer, and started talking to the victim. The victim and the defendant then left the bar together at approximately 12:30 a.m. They both walked to their vehicles; the defendant made a U-turn and stopped his vehicle on the street, while the victim pulled up beside him, and they both turned south traveling in the same direction. A patron at the Sports Page Bar & Grill, Merle Kennett, testified to essentially the same facts elicited from Davis. Both Davis and Kennett described the defendant's car as dented and beat-up and both witnesses identified the defendant in a lineup as the man they had seen in the bar that night.

Thereafter, at approximately 12:45 a.m., a bartender at the Main Street Saloon, Linda Berry, saw the victim and the defendant enter the establishment. The victim asked the bartender for a magic marker and the defendant then proceeded to write on the saloon's wall, which was something patrons typically did at the saloon. The

victim then ordered a six-pack of Miller Lite to go; then she and the defendant left the saloon together.

Scott Nielson testified that he had shared a cell with the defendant in the Clinton County jail. He stated that defendant had told him that he was in jail because he had met a girl in a bar, they had a beer, and then they went to another bar. Defendant said that they had danced a little bit, had a couple of drinks, and that he had signed his name underneath hers on the wall of one of the bars. They then got some beer and went back to her house. At her house, they walked in, and he grabbed a beer and sat down. She went to the kitchen to put the rest of the beer away, and then came back and she put a Bob Seger tape in the tape deck. The two then sat there and drank until he tried to "make moves" on the woman. The woman resisted his advances. Defendant then got up to go to the bathroom, got another beer and returned, at which time he again tried to "make the moves on her." Again, she told him "no," and she shoved him. Defendant told Nielson that he slapped the girl a couple of times, then blacked out. The next thing the defendant remembered was waking up in the morning at a convenience store where he got gas.

Approximately a month after the victim's body was found, Natalie and her family returned to the house to retrieve the victim's possessions and they discovered that the victim's new black purse was missing and that a Bob Seger tape was inside the tape deck they took with them. On March 22, 1990, a high school student, Steve Holtgrave, found the victim's black purse in a cornfield approximately a mile south of Beckemeyer with the victim's driver's license and a billfold with pictures, but no money.

David Peck, a forensic scientist specializing in latent fingerprints and footwear, testified at trial that in comparing the tennis shoes that the defendant was wearing

at the time of his arrest with the shoeprints collected at the crime scene, two prints were made by the defendant's left shoe, one print was made by the defendant's right shoe, two other prints could have been made by the defendant's right shoe, and one other print could have been made by the defendant's left shoe. In comparing inked bare footprints collected from the defendant with those found at the crime scene, Peck concluded that one of the latent footprints found at the scene was made by the defendant. Peck also concluded that defendant's fingerprint, made in an oily substance, was present on the doorknob on the door between the living room and bedroom at the crime scene.

Cheryl Cherry, a forensic scientist, compared the wax droplets found on the victim's body with wax droplets collected from the defendant's bathtub in his apartment following his arrest. Using a thin-layer chromatography test, Cherry performed various analyses on the wax specimens and concluded that they were similar and could have originated from the same candle.

Eleanor Gillespie, a forensic microscopist, testified that she compared the standards of the defendant's head, chest, and pubic hair to the hairs collected from the victim's body. Gillespie concluded that there had been no hair transfer between the defendant and the victim.

## VERDICT AND SENTENCING HEARINGS

In convicting the defendant of all five counts of murder at the close of the bench trial, Circuit Judge Dennis Huber found that he had "no doubt at all but that the defendant is guilty" of counts I, II, and III (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3) (first degree murder)). Judge Huber then stated that counts IV and V, the felony murder charges, "necessitated more consideration by the court." Nevertheless, after considering the direct evidence and "the substantial amount of

circumstantial evidence," Judge Huber found that the defendant was guilty beyond a reasonable doubt of murder while attempting to commit aggravated criminal sexual assault and while committing robbery.

With regard to the felony murder charge involving attempted aggravated criminal sexual assault, Judge Huber stated that the charge is supported by "looking at the total set of circumstance" on the evening of the victim's murder. Specifically, Judge Huber focused on the manner in which the victim's clothes were removed: (1) the victim's jeans were found at the scene of the crime inverted, indicating that they were taken off the victim by someone else; (2) the fact that the victim's green blouse was found twisted around her neck, intertwined with a necklace, suggesting that the clothing was removed by someone else; and (3) the fact that the victim's bra was removed in such a fashion as to actually tear a piece of the bra.

Further, with regard to the felony murder charge involving robbery, Judge Huber found that the "total picture" convinced him beyond a reasonable doubt that the defendant took the purse at the time of the murder. In so ruling, Judge Huber considered the following: (1) the victim was seen on the evening of the murder with the purse; and (2) it can be inferred that the victim carried her purse back to her house since in all likelihood the keys to her car and house would have been kept in her purse. Finally, in convicting the defendant, Judge Huber found that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

At the first stage of the sentencing hearing, Judge Huber found that the defendant was over the age of 18 when he committed the charged offenses, that the victim was killed in the course of a robbery, and that defendant was committing the robbery while attempting to commit aggravated sexual assault. The trial court reiterated its

finding that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. Judge Huber then concluded that the defendant was eligible for the death penalty.

At the second stage of the sentencing hearing, the State, through the testimony of Joyce Ely, showed that the defendant had worked in a facility that cared for mentally retarded individuals, and that he had been fired for using excessive force with two patients. Additionally, defendant's ex-wife testified that the defendant had a bad temper and occasionally became physically violent with her. Defendant's ex-wife further testified that defendant liked to tie her up during sex. She stated that he enjoyed having pain inflicted on him during the sexual act, and that he always had candles or incense burning as well. She also stated that she got fired from her job because the defendant had shown up there, started an argument with her, and threatened to kill a fellow employee if he did not get out of his way.

Also included in the evidence presented at the second stage of the sentencing hearing was 16-year-old Lorri Ann Barnes' testimony that the defendant stopped to help her when she got her car stuck as she was leaving Carlyle Lake on July 11, 1989, the same date that the victim encountered the defendant. Barnes stated that the defendant was driving an older blue car that was not in good condition. Defendant tried to comfort her by putting his arms around her. Defendant also kissed the girl on the lips to which she briefly responded. The defendant then asked her to come back to his apartment with him. Barnes then told him that she could not do so because she had to find her friend. Defendant then offered to help find her friend. While the defendant was looking, Barnes left the area because she "didn't want to be with him."

The defendant's mother also testified at the second stage of the sentencing hearing and stated that the defendant had lived with women to whom he was not married.

In sentencing the defendant, Judge Huber found that the only applicable statutory mitigating factor was that the defendant had no significant history of prior criminal activity. The court also considered whether the defendant was under extreme mental or emotional disturbance at the time of the offense, but found that no competent evidence had been produced to support this mitigating factor. The court also indicated that it took into consideration other nonstatutory mitigating factors argued by defense counsel including defendant's apparent alcoholism and drug use, his learning disability, his Christian background, his alleged suicide attempts, and general sympathy. In aggravation, the court found that the murder had been committed in the course of two felonies and that it had been accompanied by brutal and heinous behavior indicative of wanton cruelty. Judge Huber then concluded that the aggravating factors outweighed the mitigating factors, and sentenced the defendant to death.

## TRIAL ISSUES

On appeal, this court must first determine whether any of the trial errors claimed by the defendant require reversal of the defendant's conviction. We find no merit to the defendant's alleged trial errors and affirm the defendant's conviction.

The defendant first argues that the trial court erred by allowing Scott Nielson, a jailhouse informant, to testify at trial that he had given police a written statement that was consistent with his testimony at trial. Defendant asserts that the admission of the prior consistent statement was prejudicial and that defense counsel was

ineffective for failing to object to this testimony at trial or raise the issue in a post-trial motion. The record reflects, however, that Nielson never stated that the statement given to the police was consistent with his testimony at trial and was not asked about its contents. Rather, the only detail the State sought to elicit from Nielson was the date on which the statement was made. Thus, it is reasonable to conclude that the prosecutor was simply laying a foundation for the introduction of the statement should defense counsel attempt to show that Nielson had a motive to testify falsely.

Additionally, even assuming that defense counsel should have objected to Nielson's testimony, the defendant has failed to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) At a bench trial, the trial judge is presumed to consider only proper evidence. (*People v. Guest* (1986), 115 Ill. 2d 72, 109.) Accordingly, it must be presumed that Nielson's statement was considered by the trial judge only for any value it might have had in rehabilitating defense counsel's attempted impeachment of Nielson, after which the written statement was admitted. Moreover, the evidence of the defendant's guilt in the instant case is overwhelming. As stated by this court in *People v. Ashford* (1988), 121 Ill. 2d 55, 72, "[i]ndeed, the entire record in this case bespeaks the guilt of the defendant and compels the conclusion that the admission of the prior consistent statement was not a material factor in his convictions."

The defendant next contends that the trial court erred in allowing Nielson to testify as to other-crimes evidence and that this denied him a fair trial. Over the objection of defense counsel, Nielson testified that defendant told him that on the morning of July 12, 1989, he

went to Decatur to "a guy's house that owed him some money for cocaine" and that because the man did not have the money he threw him against a wall, slammed the man on the table, and took $89 from him. The defendant failed to raise this issue in his motion for a new trial. This court has previously held that questions concerning the propriety of other-crimes evidence, which are not properly preserved in a post-trial motion, need not be considered on review unless admission of the evidence constituted plain error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 198.) Justice does not require the application of the plain error doctrine in cases where evidence of the defendant's guilt is overwhelming. (*Enoch*, 122 Ill. 2d at 198-99.) Such is the case here.

The defendant next argues that the trial court erred in accepting forensic scientist Cheryl Cherry's testimony that she had compared and found similarities between the candle wax found on the victim's body and wax taken from the defendant's bathtub. Defendant asserts that Cherry's testimony was improper because the trial judge could have determined for himself if the wax droplets were similar and Cherry did not testify that thin-layer chromatography, a test utilized by Cherry in distinguishing the dyes found in the wax samples, had gained general acceptance as a reliable test. The State counters by arguing: (1) Cherry, through her training as a forensic scientist, examined the wax samples with a stereoscopic microscope and made determinations regarding similarities in their physical characteristics, which the trial court would not be able to perform; (2) the trial court could have concluded that the use of thin-layer chromatography is generally accepted by forensic scientists as a reliable test; and (3) any challenges to the testing process could have been brought out by the defendant through

cross-examination of Cherry or the presentation of the defendant's own witnesses.

Thin-layer chromatography is a comparative test which requires the use of a standard, a substance that has been positively identified, with which the unknown substance can be compared. (*People v. Bertram* (1977), 45 Ill. App. 3d 70, 71-72.) It is a standard test employed by forensic scientists in testing and evaluating substances to determine if they are illegal narcotics. (*People v. Brannon* (1978), 59 Ill. App. 3d 531.) Although Cheryl Cherry testified that thin-layer chromatography is a technique whereby dyes are chemically extracted from a substance or substances and then examined for their reaction in different liquids, Cherry never testified on the general scientific acceptance of employing this test for such a purpose or for distinguishing such substances as wax samples. We believe that the trial court, as a foundation for this aspect of Cherry's testimony, should have at least elicited testimony from Cherry that thin-layer chromatography is generally accepted by forensic scientists as a reliable test for distinguishing dyes in unknown substances such as wax samples. *People v. Thomas* (1990), 137 Ill. 2d 500, 518.

Nevertheless, we find that no prejudicial error occurred from the admission of this evidence. Cherry merely opined that, based on the thin-layer chromatography test results, the wax samples were similar and "could have originated from the same candle." This is essentially the same conclusion she reached after examining and comparing the physical characteristics of the wax samples under a stereoscopic microscope, which she was clearly qualified to perform as a forensic scientist. Thus, any error created by the admission of Cherry's testimony was harmless. Moreover, in addition to the evidence of the candle wax, there was other strong, unrebutted physical evidence in this case, including defend-

ant's shoeprints, bare footprint, and fingerprint at the crime scene. This direct evidence, when considered with the circumstantial evidence against the defendant, overwhelmingly demonstrated his guilt.

## DEFENDANT'S DEATH SENTENCE

The defendant next maintains that his death sentence should be vacated on numerous grounds. We disagree.

The defendant first asserts that waiver of his right to be sentenced by a jury was not knowing and intelligent because the trial court failed to tell him that any juror could prevent imposition of the death sentence, and because the trial court stated the jury would have to unanimously find the presence of mitigation in order to impose a sentence other than death. Both claims are meritless. This court has consistently declined to require that a valid admonition include an explanation that the vote of a single juror is sufficient to preclude imposition of the death penalty. (*People v. Eyler* (1989), 133 Ill. 2d 173, 223-24.) Additionally, a thorough examination of the record reflects that Judge Huber correctly informed the defendant that after the jury heard evidence in mitigation, the jury would then again have to unanimously decide whether to impose the death penalty. Judge Huber simply did not state that the jury would have to unanimously find the presence of mitigation not to impose the death penalty. As such, no error occurred.

The defendant next contends that he was improperly found eligible for the death penalty on the ground that he committed a murder in the course of a robbery. The defendant argues that the State failed to produce evidence that he took the victim's black purse on the night of the murder. We affirm the trial court's finding that the substantial amount of circumstantial evidence in this case supports a conclusion, beyond a reasonable doubt, that the defendant took the purse on the night that he

viciously killed the victim. First, the victim was seen carrying the purse in the afternoon and evening on the day and evening that she encountered the defendant. Second, as Judge Huber found, it is reasonable to presume that the victim, after meeting the defendant at the bars on the evening of her murder, carried her purse back to her house since in all likelihood the keys to her house and car would have been kept in her purse. Further, it is readily apparent that after arriving at her home, the victim was confronted with brutal force after she refused the defendant's sexual advances. Finally, when the black purse was found in the cornfield subsequent to the victim's murder, the purse contained no money.

In establishing eligibility for the death penalty based on murder in the course of a specified felony (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)), it is sufficient if the State proves the elements of the crime and that the accompanying felony was part of the same criminal episode. (*People v. Thomas* (1990), 137 Ill. 2d 500, 533-34.) Moreover, it is not imperative that the State prove beyond a reasonable doubt that defendant formed the criminal intent to commit the robbery before committing the murder. (*People v. Thomas* (1990), 137 Ill. 2d 500, 534.) We find that the trial court, as the rational trier of fact and based on the evidence presented, could properly conclude that the victim's purse was forcibly taken from the victim on the night that defendant committed the murder, and thus the crimes were all part of the same criminal episode.

The defendant next contends that he was improperly found eligible for the death penalty based on the statutory aggravating factor that he committed the murder in the course of an attempted aggravated sexual assault. Judge Huber found that "the total set of circumstances" on the evening of the victim's murder convinced him that the defendant murdered the victim

while attempting aggravated sexual assault. Judge Huber found that the evidence indicated that the victim's clothes were forcibly removed by someone else, the victim's jeans were turned inside out, the victim's bra was torn, and the victim's green blouse was found twisted around her neck, intertwined with a necklace. This evidence, coupled with the overwhelming evidence that the victim was severely beaten and strangulated, thus indicating lack of consent, supports the trial court's conclusion.

A person commits an attempted aggravated criminal sexual assault when "with intent to commit [aggravated criminal sexual assault], he does any act which constitutes a substantial step toward the commission of that offense." (Ill. Rev. Stat. 1989, ch. 38, par. 8—4.) This court has previously held that "[e]vidence of an assault with concomitant disrobing of the victim is sufficient to support a conviction for attempted rape." (*People v. Enoch* (1988), 122 Ill. 2d 176, 198.) We find that based on the evidence presented that the trial court, as the rational trier of fact, could have found, beyond a reasonable doubt, that the defendant murdered the victim while in fact attempting aggravated criminal sexual assault.

Defendant next asserts that he was improperly found eligible for the death penalty under section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7)), which requires that the victim was under 12 years of age and that the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. The record does not support a finding that the trial court was specifically relying on this statutory factor in finding the defendant eligible for the death penalty. Moreover, even if the trial court improperly relied on section 9—1(b)(7), it would not alter the court's finding that the defendant was independently eligible for the death penalty on the basis that the murder was commit-

ted in the course of a robbery and while attempting to commit aggravated criminal sexual assault.

The defendant also maintains that the trial court incorrectly decided at the second stage of the sentencing hearing that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The defendant contends that the language the trial court used in making that finding is unconstitutionally vague and is prohibited by recent pronouncement of the United States Supreme Court in *Stringer v. Black* (1992), 503 U.S. 222, 117 L. Ed. 2d 367, 112 S. Ct. 1130. This decision, however, is inapplicable to the instant case since the Illinois death penalty statute, unlike the Mississippi death penalty statute construed in *Stringer*, does not weigh factors in aggravation and mitigation in determining whether a defendant is eligible for the death penalty. A death penalty hearing in Illinois consists of a two-stage process. At the first stage, it is determined whether someone is eligible for the death penalty. Illinois has a nonweighing statutory scheme to determine if someone is eligible for the death penalty. So long as the sentencing body has found at least one valid aggravating factor, the fact that it also may have considered an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. The weighing and balancing of aggravating and mitigating factors takes place only during the second stage, after a defendant is found eligible for the death penalty and is done to determine whether the death sentence should in fact be imposed. Here, at the first stage of the sentencing proceedings, the trial judge expressly found the existence of two additional aggravating factors, which independently rendered the defendant eligible for the death penalty. Having found the defendant eligible for the death penalty, the trial judge was free to consider, at the second stage of the sentencing

hearing, the circumstances of the defendant's offenses. This court has consistently held that the sentencing body is free in the second phase of the sentencing hearing to consider any relevant and reliable evidence in aggravation and mitigation, including the brutal and heinous manner in which the defendant murdered his victim. *People v. Terrell* (1989), 132 Ill. 2d 178, 225.

The defendant raises three additional arguments regarding sentencing that are totally without merit and are summarily rejected by this court: (1) that the trial court refused to consider evidence of nonstatutory mitigating factors; (2) that irrelevant, inadmissible, and prejudicial testimony was presented during the sentencing hearing through the testimony of Lorri Ann Barnes, the victim's mother, and Joyce Ely; and (3) that the death penalty is unconstitutional. First, the record indicates that Judge Huber did properly weigh the evidence which the defense presented in mitigation, including evidence of nonstatutory mitigating factors. Second, we find that the evidence that was presented during the sentencing hearing was both reliable and relevant regarding the defendant's character. Third, this court has repeatedly rejected the constitutional attacks that the defendant seeks to wage on the Illinois death penalty. *People v. Simms* (1991), 143 Ill. 2d 154.

## ˙CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentence of death. We hereby direct the clerk of this court to enter an order setting Thursday, January 14, 1993, as the date on which the sentence of death entered by the circuit court of Clinton County shall be carried out. The defendant shall be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 119—5). The clerk of this court shall send a

copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*Affirmed.*