In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1250

Robert Todd,

Petitioner-Appellant,

v.

James Schomig, Warden, Pontiac Correctional
Center,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98-428-GPM--G. Patrick Murphy, Chief Judge.

Argued October 9, 2001--Decided March 14, 2002

  Before Flaum, Chief Judge, and Evans, and
Williams, Circuit Judges.

  Williams, Circuit Judge.  Petitioner
Robert Todd is on death row. The direct
and post-conviction challenges to his
conviction and death sentence have proven
unsuccessful. He filed a petition for a
writ of habeas corpus, which the district
court denied. Now, he appeals and asks us
to reverse the district court's decision.
Because there is no basis upon which to
grant his petition, we affirm the
judgment of the district court.

I.  BACKGROUND

  On June 1, 1998, Todd filed a petition
for a writ of habeas corpus, challenging
the constitutionality of his custody in
the Pontiac Correctional Center, where he
is on death row for his state court
conviction of first-degree murder. Our
review of his challenge to his conviction
and death sentence is controlled by the
restrictive standards set forth in the
Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"). See 28 U.S.C. sec.
2254; see also Lindh v. Murphy, 521 U.S.
320 (1997) (applying the statute to
petitions filed after April 24, 1996).
Pursuant to the AEDPA, state court
factual findings that are reasonably
based on the record are presumed correct,

and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. See 28 U.S.C. sec. 2254(e)(1); see also Cossel v. Miller, 229 F.3d 649, 651 (7th Cir. 2000). The following summary of the facts is derived from the state court opinions, and is supplemented where appropriate from the appellate record. See Whitehead v. Cowan, 263 F.3d 708 (7th Cir. 2001).

A.  The Facts

On July 11, 1989, Sandra Shelton entered the Sports Page Bar & Grill in Carlyle, Illinois. Shortly thereafter, Robert Todd entered the bar, sat next to her, ordered a draft beer, and started a conversation. They left together at approximately half-past midnight and went to the Main Street Saloon in Beckemeyer, where they danced, had a couple drinks, and left.

They then went to Shelton's home. According to the testimony of jailhouse informant, Scott Nielson, Todd described the events at Shelton's home as follows: Shelton put on a Bob Seger tape, and they sat and drank. Todd tried to "make moves" on Shelton, but she resisted. A bit later, Todd tried again, but Shelton told him "no" and shoved him. Todd slapped Shelton a couple times, but he then blacked out and next remembered waking up in the morning at a convenience store.

Shelton's 14-year-old daughter discovered her mother's body at eleven the next morning. In the home, the stove burners were running, creating a strong odor of natural gas; several candles were still burning; and a container of vegetable oil was on the floor in the living room.

Shelton's body was nude except for a green blouse tied around her neck, intertwined with a necklace and two shoe strings that were tied to her right wrist. Shelton's body appeared to have a shiny, oily substance on it, and small red droplets of wax were spread over her body from the shoulders down.

A red candle and a Miller Lite beer can were underneath a blanket that partially covered Shelton's left foot. Another can of Miller Lite was on an ashtray table, and a six-pack of Miller Lite with two cans missing was in the refrigerator./1

Pathologist Dr. Steven Nuernberger performed an autopsy and found a linear depression on Shelton's neck, where the blouse had been. He noticed hemorrhaging to the muscles on both sides of the neck, indicating that Shelton's trachea had been crushed. He listed strangulation as the primary cause of death.

He noticed five stab wounds down the left side of Shelton's body. Four penetrated her chest wall. There was a small amount of blood in Shelton's chest cavity and abdomen, which indicated that she was stabbed at the time of her death or shortly thereafter. In his opinion, the stab wounds were caused by a sharp knife, and were to "mak[e] sure the victim was dead."

He also observed bruising and swelling around Shelton's left eye, left lower lip, and cheek bone. He noted hemorrhages that indicated blunt trauma to her head. In his opinion, the head injuries were caused by at least five separate blows to her head. Dr. Nuernberger observed bruises or contusions on Shelton's wrist, right shoulder and breast. The wrist bruise was consistent with someone tightly grabbing the wrist, and the chest bruise indicated a blow to the chest.

Dr. Nuernberger believed that Shelton was standing when she was suffocated. He also believed that the wax droplets were applied after death. Although Dr. Nuernberger found no identifiable presence of sperm and no evidence of trauma to the vagina or rectum, in his opinion, these facts did not rule out the possibility of sexual assault.

Forensic scientist David Peck examined the tennis shoes Todd was wearing at the time of his arrest with the shoe prints collected at Shelton's home. He concluded that two prints were made by Todd's left shoe and one was made by his right shoe. He also compared inked bare footprints of Todd's feet with footprints at Shelton's home, concluding that one of the latent footprints at Shelton's home was Todd's. He also concluded that Todd's fingerprint was present on one of the doorknobs in Shelton's home.

Forensic scientist Cheryl Cherry compared the wax droplets on Shelton's

body with wax droplets from Todd's bathtub, and she concluded that they were similar and could have originated from the same candle. Forensic microscopist Eleanor Gillespie compared the standards of Todd's hair to the hairs from Shelton's body, and she concluded that there was no hair transfer between Todd and Shelton.

After a bench trial, Todd was convicted of first-degree murder and attempted aggravated sexual assault. The trial court concluded that the murder was accompanied by brutal and heinous behavior indicative of wanton cruelty. At the first stage of the sentencing, the sentencing court found Todd eligible for the death penalty because the murder was committed in the course of a robbery and while attempting to commit aggravated criminal sexual assault.

At the second stage of the sentencing, the state presented its case in favor of the imposition of the death penalty. Joyce Ely testified that Todd had worked for a facility for the mentally retarded, but was fired for two incidents with patients--one in which he put a yelling and aggressive patient in an arm-lock and another in which he attempted to prevent an upset patient from leaving the area by pushing him back with his fingers. Todd's ex-wife, Shelly Steele, testified that he had a bad temper and was occasionally physically violent. She also testified that he liked to tie her up during sex, enjoyed having pain inflicted on himself during sex, and always had candles or incense burning during sex. She also testified that she was fired from her job because Todd showed up, started an argument with her, and threatened to kill another employee if he did not get out of his way.

Then Todd presented mitigation evidence. Mitigation Social Worker Arlene Peters recounted Todd's background, including his alcoholism, drug use, suicide attempts, physical abuse, and troubled childhood. Her investigation, however, was limited--principally to Todd's immediate family. Todd's reverend, fiancee's parents, and family also testified, essentially to his good character, and helped to corroborate the mitigation social worker's report.

The sentencing court determined that only one statutory mitigating factor had been presented--lack of significant prior criminal history--in addition to evidence of nonstatutory mitigating factors. The court determined that the aggravating factors outweighed the mitigating factors and sentenced Todd to death.

## B.  District Court Proceeding

Following unsuccessful direct appeals and post-conviction proceedings, see People v. Todd, 607 N.E.2d 1189 (Ill. 1992); Todd v. Illinois, 510 U.S. 944 (1993) (direct); People v. Todd, 687 N.E.2d 998 (Ill. 1997); Todd v. Illinois, 525 U.S. 828 (1998) (post-conviction), Todd filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Illinois. He raised approximately twenty-six grounds for relief, not counting the various separate factual allegations that supported his primary arguments. In an extensive and well-reasoned opinion, the district court rejected all of Todd's reasons for granting a writ and denied his petition. Todd now appeals.

## II.  ANALYSIS

A writ of habeas corpus may be granted only if the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. See id. at sec. 2254(d); see also Williams v. Taylor, 529 U.S. 362 (2000); Boss v. Pierce, 263 F.3d 734 (7th Cir. 2001). While we carefully scrutinize the issues presented in capital cases, see Zant v. Stephens, 462 U.S. 862, 884 (1983), as in all cases, our review of issues of law is de novo and of fact, for clear error. See, e.g., Dixon v. Snyder, 266 F.3d 693, 700 (7th Cir. 2001).

## A.  Procedural Default

To begin, we must determine which of Todd's claims are properly before this court. In order to raise a constitutional challenge to a state court conviction and

sentence in a federal habeas proceeding, the petitioner must have fully and adequately presented the challenge to the state courts. See O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999); Chambers v. McCaughtry, 264 F.3d 732, 737-38 (7th Cir. 2001).

Many of Todd's claims were not raised in his direct or post-conviction proceedings before the state courts, and therefore are defaulted./2 Procedural default may be excused for cause and prejudice or if it will result in a fundamental miscarriage of justice, see Coleman v. Thompson, 501 U.S. 722, 750 (1991); Wainwright v. Sykes, 433 U.S. 72, 87 (1977), but Todd has not argued that any of these reasons prevented him from raising his claims in the state courts. Therefore, we do not consider his defaulted claims.

B.  Brady Violation

Todd argues that the state suppressed material impeachment evidence of an agreement with jailhouse informant Nielson in exchange for his testimony at trial. He argues that Nielson's testimony regarding what happened at Shelton's home was "the lynchpin of the State's case." Therefore, he argues, the state violated the Fourteenth Amendment by suppressing the agreement. See Brady v. Maryland, 373 U.S. 83 (1963). We reject this claim on the merits, rather than addressing the somewhat more difficult question of whether it is procedurally defaulted. See 28 U.S.C. sec. 2254(b)(2).

Todd cannot prove an agreement existed. He argues that at the very least Nielson had an "expectation" of benefit. But what one party might expect from another does not amount to an agreement between them. And Todd does not argue that the state knew of Nielson's expectation or that he could not have uncovered that expectation with reasonable diligence. This brings us back to the agreement, which Todd cannot show existed. Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a Brady violation.

But Todd claims that he should have been granted a hearing in the district court to establish evidence of an agreement. That would have been little help to him

in advancing his claim. Nielson was hardly the lynchpin that Todd characterizes him as. Nielson merely told the court what other evidence had already revealed. Forensic evidence placed Todd in Shelton's home. Autopsy evidence of Shelton's body showed the violent and forceful nature of the murder. And, that Nielson knew of particular non-public, corroborated facts (e.g., the Bob Seger tape)/3 made his testimony more reliable and the value of any impeachment evidence minimal.

The possible existence of an agreement with this witness does not undermine our confidence in the conviction. Without any means of establishing a reasonable probability of a different outcome, the evidence cannot be considered material, or its suppression a Brady violation. See, e.g., Kyles v. Whitley, 514 U.S. 419, 434 (1995).

C.  Unanimous/One-Juror Rule

The state trial court twice informed Todd that "all twelve jurors would have to unanimously agree on [the] mitigating factors to prevent imposition of the death penalty." Todd argues that he waived his right to a jury sentencing because  the court's statement led him to believe that it was easier to convince one judge rather than all twelve jurors not to impose the death penalty. Furthermore, he asserts that he was not informed of Illinois' "one-juror" rule; effectively the flip-side of the requirement of a unanimous verdict, the one-juror rule is simply that the vote of one juror may preclude the death penalty. See, e.g., People v. Nitz, 572 N.E.2d 895, 916 (Ill. App. Ct. 1991). Todd argues that not knowing of this rule, combined with the trial court's false statement of the standard, made his waiver of his right to a jury at sentencing involuntary, violating the Seventh Amendment.

Todd's claim would have significant force, if it were in fact true. The record, however, does not bear out his version of the facts. In a thorough waiver hearing, the trial court informed Todd that any statutory eligibility factor must be unanimous, and that the vote for the death penalty must be unanimous. And although Todd was not

informed of the one-juror rule specifically, he was informed that all the jurors would have to agree on the death sentence, which is effectively the same thing. We reject his argument, and find that the Illinois Supreme Court's rejection of it was reasonable. See Todd, 607 N.E.2d at 1196.

D. Ineffective Assistance of Counsel

Todd argues that his trial counsel was constitutionally ineffective because he failed to (1) investigate adequately, obtain, or present hair transfer evidence; (2) file Todd's request to withdraw his jury waiver; and (3) investigate and present additional mitigation evidence./4 In addition, healleges that defense counsel pressured him to waive his right to a jury trial. All this conduct, he argues, prejudiced his case and resulted in his conviction and death sentence, violating the Sixth Amendment.

To show ineffective assistance of counsel, Todd must demonstrate that counsel's performance fell below an objective standard of reasonableness, and he was prejudiced as a result of that performance. See Strickland v. Washington, 466 U.S. 668, 687-90 (1984); United States v. Hodges, 259 F.3d 655, 658 (7th Cir. 2001). We apply a highly deferential presumption in favor of the reasonable exercise of professional judgment. See Strickland, 466 U.S. at 689.

The Supreme Court has often stated that the Constitution does not guarantee criminal defendants a perfect trial, only a "fair" one. See Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). That statement is apt here. Todd's counsel was not perfect, and with the benefit of hindsight, it is easy to indulge the temptation to question his decisions during trial and sentencing. But his performance was sufficient to ensure a fair adjudication of Todd's guilt and sentence.

First, defense counsel elicited testimony from Illinois State Police Forensic Scientist Eleanor Gillespie that none of the hairs found at the scene were Todd's and that there was no transfer of hair between Todd and Shelton. Moreover,

he argued that this evidence was inconsistent with the type of struggle the state alleged. He could have done more, granted. But we do not measure deficiency by how much more defense counsel could have done, but by the adequacy of what counsel did do. Employing an objective standard of reasonableness, defense counsel's performance in this regard was reasonable and adequate.

Second, we have no basis upon which to conclude that Todd ever asked his defense counsel to file a motion to withdraw his jury waiver. In a post-conviction deposition, his defense counsel denied any such request. And even extending this assumption to Todd, we have no basis upon which to conclude that the trial court would have allowed Todd to withdraw his plea. Todd has provided no credible evidence.

Third, regarding mitigation evidence, defense counsel brought forward Todd's family,/5 reverend, and a mitigation social worker. Todd asserts that the mitigation social worker's report was not very thorough, and was largely unsubstantiated. The report merely summarized Todd's life, focusing on his troubled childhood, suicide attempts, alcohol and drug abuse, and some physical abuse he suffered.

Todd now claims that trial counsel should have developed and presented additional mitigation evidence that was available. At his post-conviction hearing, Todd brought forward much more compelling mitigation evidence. For example, the clinical psychologist who testified at the post-conviction hearing conducted a more thorough investigation, and uncovered additional physical and sexual abuse. At his post-conviction hearing Todd introduced expert testimony, along with additional, substantiated evidence of low intelligence (an IQ of 86), physical and sexual abuse, and emotional and psychological damage (possibly amounting to an additional statutory mitigating factor).

However, at trial, defense counsel apparently decided not to present psychiatric evidence or pursue it further because he believed it would only expose Todd's propensity for violence. He based

that decision in part on a psychiatric evaluation that was performed before trial. But Todd's propensity for violence was already front and center in his sentencing hearing. His ex-wife testified about his violent propensities and of her fear of his violent nature--which prompted her to acquire a Doberman Pinscher for her own protection. The nursing home supervisor testified that Todd was fired because of his unnecessary use of force. Furthermore, the trial court's conclusion that Shelton's murder was accompanied by brutal and heinous behavior indicative of wanton cruelty should have put defense counsel on notice that the cat was out of the bag.

While we believe counsel's performance was less than stellar, the Illinois Supreme Court was not persuaded. See Todd, 687 N.E.2d 998, 1008-11 (Ill. 1997). It believed that Todd's defense counsel made a strategic decision after investigation, to which deference was due. Also, it did not believe that the additional mitigation evidence would have affected the sentencing judge's decision to impose the death penalty, given the circumstances. See id. at 1011. Although we are less convinced, we cannot say that the Illinois Supreme Court's decision was unreasonable in light of the very damning aggravating circumstances in this case.

Finally, we have no basis upon which to conclude that Todd's counsel "pressured" him to waive his right to a jury trial. Indeed, the credible evidence before us is solidly to the contrary, that his waiver was informed, knowing and voluntary. Most convincingly, the trial court conducted a thorough hearing on the waiver, after which it concluded that his waiver was knowing and voluntary.

Because we have addressed all of Todd's claims of deficient and prejudicial performance and find them to be meritless, we reject Todd's claim of ineffective assistance of counsel. Overall, we find reasonable the Illinois Supreme Court's decision. See Todd, 687 N.E.2d at 1003-13.

E.  Sufficiency of the Evidence

Todd argues that the state failed to prove beyond a reasonable doubt each and every element of his two statutory eligibility factors for the death

penalty, violating both the Eighth and the Fourteenth Amendments./6 See In re Winship, 397 U.S. 358 (1970); Gregg v. Georgia, 428 U.S. 153 (1976). Both arguments are meritless.

1. Robbery

The state alleged that Todd took Shelton's purse. Illinois defines robbery as the taking of property from the person or presence of another by the use of force or by threatening the imminent use of force. See 720 Ill. Comp. Stat. 5/18-1(a). If Todd did in fact take Shelton's purse, then the conclusion that the taking was by the use of force and from her presence follows ineluctably on these facts. See, e.g., People v. Blake, 579 N.E.2d 861 (Ill. 1991) (upholding armed robbery conviction, despite the fact that victims were separated, by one level of the house, from the property taken and had not been in contact with those items for some six or seven hours during the night); People v. Carreon, 587 N.E.2d 532 (Ill. App. Ct. 1992) (finding that dead person has "presence").

Todd focuses his argument on the conclusion that he took the purse. He challenges the trial court's resolution of the question of whether the victim's purse was brought inside her home or left in her car, but does not dispute the determination that Shelton brought the purse home. Todd argues that if the purse was in Shelton's open car, which he believes is the only supportable conclusion, anyone could have taken it. Why the particular location of the purse at the home matters at all is not clear to us, as anyone could have taken it from her open home as well.

In either place, however, Todd is the person most likely to have taken the purse. Todd was seen with Shelton the night she had her purse. Todd was in Shelton's home that night as well. Todd murdered Shelton. Then, Shelton's family discovered that her purse was missing. It was found later in a cornfield. Along the way a number of things could have happened to the purse, but on these facts, a rational conclusion beyond a reasonable doubt is that Todd took the purse. We therefore reject his argument, and find the Illinois Supreme Court's

decision reasonable. See Todd, 607 N.E.2d at 1196-97.


2. Attempted Aggravated Criminal Sexual Assault

Illinois defines aggravated criminal sexual assault as (1) the commission of an act of sexual penetration (a) by the use of force or threat of force or (b) with knowledge that the victim was unable to understand the nature of the act or was unable to give knowing consent, and (2) during the commission of the offense, any one of ten aggravating circumstances is present, e.g., the defendant displayed, threatened to use, or used a dangerous weapon; caused bodily harm to the victim; threatened or endangered the life of the victim; or perpetrated the offense during the course of the commission or attempted commission of any other felony. See 720 Ill. Comp. Stat. 5/12-13(a)(1)-(2), 5/12-14(a)(1)-(10). An attempt is defined as the doing of any act that constitutes a substantial step toward the commission of a specific offense with the intent to commit that offense. See 720 Ill. Comp. Stat. 5/8-4.

Todd argues that "[t]here was no evidence of an aggravator charged or proved." But, in Count IV of the indictment against Todd, which alleged attempted aggravated sexual assault, the state specifically charged that he "caused bodily harm to Sandy Shelton by striking and choking her." As to the evidence, the violent and statutorily aggravated nature of this murder is overwhelming. Indeed, four applicable aggravators are present in this case. There is evidence that Todd used a sharp knife, which is a dangerous weapon, to stab Shelton; caused significant bodily harm to Shelton; endangered Shelton's life; and perpetrated the offense during the course of both a murder and a robbery, which are both felonies.

That is all beside the point, however. Todd's conviction was for his attempt of the offense, not for his completion of it. Therefore, the state was not required to show any aggravating factor, but only an act that constituted a substantial step toward the commission of the offense and an intent to commit an aggravating factor (along with the other elements of

the offense). See, e.g., People v. Childress, 746 N.E.2d 783 (Ill. App. Ct. 2001). Todd's use of force in this circumstance could have qualified as a substantial step, and the state would have only needed to show intent to commit the other elements, including an aggravating factor. We therefore reject his argument, and find the Illinois Supreme Court's decision reasonable. See Todd, 607 N.E.2d at 1197.

F.   Evidentiary Rulings

   Todd makes two constitutional arguments regarding inadmissible hearsay and irrelevant evidence, based on the court's admission and consideration of that evidence at sentencing. We reject them both.

   1.   Hearsay

   Todd argues that the sentencing court admitted hearsay, which violated the Sixth Amendment. In addition, he argues that the sentencing court's reliance on hearsay evidence introduced intolerable uncertainty and unreliability into the sentencing process and violated the Eighth and Fourteenth Amendments. Joyce Ely, the individual who testified to Todd's termination based on two physical confrontations involving patients, did not personally witness his behavior, and in fact was not employed with the nursing home at the time of Todd's termination. Therefore, her testimony, he argues, was inadmissable and unreliable hearsay.

   However, sentencing is different from trial, and the constitutional limitations placed on the latter do not apply to the former. Hearsay may be admitted at sentencing, even in death penalty cases, without violating the Constitution. See Roberts v. United States, 445 U.S. 552, 556 (1980); Williams v. New York, 337 U.S. 241, 251 (1949). To implicate constitutional concerns, the evidence must amount to "misinformation." See United States v. Tucker, 404 U.S. 443, 446-47 (1972); Townsend v. Burke, 334 U.S. 736, 740-41 (1948). So long as the evidence is reliable and the defendant is provided notice and an opportunity to challenge its reliability, no constitutional violation results from the admission of hearsay at sentencing.

Todd cannot show any constitutional infirmity in this case. The witness testified to statements contained in Todd's employment records, which with marginally additional foundation could have qualified under the business records exception to the hearsay rule. Fed. R. Evid. 803(6). Ely relied on Todd's employment records to describe the incidents that prompted his termination. But Todd failed to refute her testimony, and to challenge the veracity of the records. He only introduced the possibility of bias in one of his supervisors. We believe that this evidence satisfied the requirements of reliability and procedural due process and reject his argument, and find that the Illinois Supreme Court's decision reasonable. See Todd, 607 N.E.2d at 1197.

## 2. Relevance

Todd argues that the trial court's consideration of his prior sexual conduct in imposing the death penalty violated the Eighth Amendment, because these characteristics made no measurable contribution to acceptable goals of punishment--retribution or deterrence.

Not all evidence of "character" qualifies as permissible aggravation evidence to be considered in the balance for imposing the death penalty. See Zant, 462 U.S. at 885. The Supreme Court has very clearly stated that aggravation evidence is of a wholly different character than mitigation evidence, and is subject to more restrictive constitutional limitations. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 304 (1987). For example, characteristics such as race, religion, or political affiliation are constitutionally impermissible and totally irrelevant to the sentencing process and the question of whether a defendant should receive the death penalty. See Zant, 462 U.S. at 885. To be sure, these three particular characteristics are plainly inimical to the "individualized" determination upon which the imposition of the death penalty must rest.

But easy examples aside, the Supreme Court, in Dawson v. Delaware, supra, carefully examined the type of evidence that may be properly considered relevant

character evidence. In Dawson, the state introduced evidence of the defendant's membership in the Aryan Brotherhood--a group that held racist, white-supremacist beliefs--in Dawson's death penalty sentencing hearing. The Supreme Court held that this evidence, in and of itself, had no relevance to any issue in the sentencing hearing. The evidence was unrelated to the crime, e.g., showing motive, see Barclay v. Florida, 463 U.S. 939 (1983) (plurality opinion), and did not contribute to establishing any aggravating circumstances. Dawson, 503 U.S. 166-67. It was merely evidence of "abstract beliefs," offered to show moral reprehensibility. Id. at 167. In addition, the Supreme Court held that the evidence was not admissible to rebut Dawson's mitigating evidence of his "good" character. The Supreme Court stated that his membership in a racist organization was simply not "bad" character evidence. Id. at 168.

Although the murder in this case involved various sexual fetishes, the state has not demonstrated that his fetishes motivated or even contributed to the murder. Moreover, the state has offered no connection between these activities and an aggravating circumstance or other questions involved in the death penalty sentencing. Thisevidence seems geared only to showing Todd's moral reprehensibleness.

While we believe that the admission of this evidence may have amounted to constitutional error, it was harmless. The statutory aggravating factors of robbery, attempted aggravated sexual assault, combined with "brutal and heinous behavior indicative of wanton cruelty," which the sentencing court described as "just for the fun of killing," were the factors the sentencing court identified and emphasized. It never mentioned Todd's past sexual conduct.

The Illinois Supreme Court never addressed these issues, but summarily rejected Todd's argument, finding only that the evidence was "reliable and relevant regarding [his] character." Though we have trouble finding this determination reasonable, we have found any constitutional error harmless.

G.  Mitigating Evidence

Todd argues that the sentencing court refused to consider and give effect to all the mitigating factors he presented, violating the Eighth Amendment. See Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978); Woodson v. North Carolina, 428 U.S. 280 (1976). He asserts that the sentencing court limited its consideration to the statutory mitigating factors available to him./7 We have reviewed the sentencing transcript and although we believe that the record is ambiguous, that conclusion necessarily requires that we defer to the Illinois Supreme Court's conclusion that the trial court "indicated" that it considered the nonstatutory mitigating factors Todd presented. See Todd, 607 N.E.2d at 1194; see also id. at 1198 ("[T]he record indicates that Judge Huber did properly weigh the evidence which the defense presented in mitigation, including evidence of nonstatutory mitigating factors.").

In the sentencing court's own words, it considered only one sentencing factor--it stated the issue was "whether or not the mittigating [sic] factor has sufficiently precluded the imposition of the death penalty" and that it believed "that the aggravating factors outweigh the mittigating [sic] factor considering the evidence in this case." The only "factor" the sentencing court identified was the statutory factor of Todd's lack of significant prior criminal activity.

However, the sentencing court did indicate that "those other nonstatutory factors do have [sic] a bearing on the Courts [sic] ability to weigh the issues I raised previously," which at least shows that the sentencing court was aware of nonstatutory mitigating factors. But what it meant by what it said, that the nonstatutory mitigating factors have a bearing on its ability to weigh the issues, is unclear. Nonstatutory mitigating factors were part of the issues it was required to consider and weigh, not merely a side-concern that bears on that question.

The sentencing court never discussed the nonstatutory mitigating factors, or the weight that it attached to them, or why the total set of mitigating factors were outweighed by the aggravating factors. Although we would have expected a more

thorough explanation, leaving no doubt about the rationale, that is not our direct concern in this case. We may only exercise our authority if the state courts' adjudications of the claim were unreasonable. And with that high standard, we have no choice but to defer to the Illinois Supreme Court's conclusion that the sentencing court did consider all the mitigation evidence Todd presented.

III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is Affirmed.

FOOTNOTES

/1 Approximately one month after Shelton's body was found, her family discovered that her purse was missing. On March 22, 1990, another seven months later, the purse was found in a cornfield some distance away.

/2 He argues that (1) the state secured an indictment against him with perjured testimony, and the indictment failed to provide him with adequate notice of the basis for the charge of attempted aggravated criminal sexual assault, violating the Fourteenth Amendment; (2) the trial court improperly admitted evidence of other crimes, where the probative value of the evidence was greatly outweighed by its prejudicial effect, violating the Fourteenth Amendment; (3) the trial court was not an impartial tribunal, violating the Sixth and Fourteenth Amendments; and (4) the state's delay in the execution of his death sentence is cruel and unusual punishment, violating the Eighth Amendment.

/3 Shelton's family returned to her home one month after the murder, and found a Bob Seger tape in the tape deck.

/4 Several of Todd's allegations of ineffective assistance were not presented to the state courts, and thus are procedurally defaulted. Although we do not discuss each of these procedurally defaulted claims in this opinion, we have considered them and conclude that they are without merit.

/5 We use this term rather broadly, including in it Todd's fiancee's parents.

/6 Illinois lists its aggravating factors within the first-degree murder statute itself. 720 Ill. Comp. Stat. 5/9-1(b) (West 2002). In this case, the trial court relied upon the felony-murder

factor, which allows for the imposition of the death penalty if "the murdered individual was killed in the course of another felony." 720 Ill. Comp. Stat. 5/9-1(b)(6). The trial court found that this murder was committed in the course of a robbery and attempted aggravated sexual assault, which qualify as predicate felonies. 720 Ill. Comp. Stat. 5/9-1(b)(6)(c).

/7 There is a non-exhaustive list of mitigating factors a trial court may consider when choosing whether to impose the death penalty. 720 Ill. Comp. Stat. 5/9-1(c). For example, the defendant's lack of prior criminal history, whether the defendant was under the influence of extreme mental or emotional disturbance when the murder was committed, or whether the defendant was personally present at the time the murder was committed are relevant mitigating factors. 720 Ill. Comp. Stat. 5/9-1(c)(1),(2), and (5).