No. 2--00--1310

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of McHenry County.

)

Plaintiff-Appellee, )

)

v. ) No. 97--CF--1519

)

EDWARD A. MILKA, )

)

Defendant-Appellant  )

  ) Honorable

(James Young, Supplemental  ) Ward S. Arnold,

Appellant).    ) Judge, Presiding.

_________________________________________________________________

JUSTICE CALLUM delivered the opinion of the court:

A jury convicted defendant, Edward A. Milka, of first-degree murder (felony murder) (720 ILCS 5/9--1(a)(3) (West 1996)).  The trial court sentenced defendant to 75 years' imprisonment.  Defendant moved for the payment of $7,000 in fees to James Young, whom the court had appointed as an expert for defendant.  The court awarded Young $3,000 in fees.  Defendant and Young appeal.  We affirm defendant's conviction but reverse his sentence and remand the cause for resentencing.  Furthermore, we affirm Young's fee award.

I. FACTS

A grand jury charged defendant with five counts.  Count I alleged that he committed first-degree murder (720 ILCS 5/9--1(a)(2) (West 1996)) in that he asphyxiated his niece, B.M., knowing that his act created a strong probability of death or great bodily harm.  Count III alleged that he committed first-degree murder (720 ILCS 5/9--1(a)(3) (West 1996)) in that he asphyxiated B.M. while committing the forcible felony of predatory criminal sexual assault of a child (720 ILCS 5/12--14.1(a)(1) (West 1996)).  Count IV alleged that he committed predatory criminal sexual assault of a child (720 ILCS 5/12--14.1(a)(1) (West 1996)) in that defendant, who was at least 17 years old, put an object into the vagina of B.M., who was less than 13 years old.  Counts II and V are not relevant here.

Before trial, defendant moved 
in limine
 to exclude a "vision statement" that he gave the police during their investigation.  The court denied the motion, deeming the statement an admission.

Also, on defendant's motion, the court appointed various experts to assist him.  Among those experts was Young, the chief coroner of Ontario, Canada.  The court ordered the county to pay Young $5,000 as a retainer for his services.

At trial, the State produced the following evidence relevant to our analysis.  John Dolan testified that on May 17, 1997, he was canoeing on the Kishwaukee River near the Hemmingson Road Bridge in Union.  He saw on a sandbar the corpse of a young girl.  The girl was nude from the waist up and had white tape on her neck.  Dolan figured that the girl was B.M., who had been reported missing from Elgin.  Dolan called the police.

On cross-examination, Dolan testified that a drive between Union and Elgin would take 30 to 40 minutes.

Jeff Skornia testified that in 1997 he was eight years old.  He lived in an apartment building in Elgin, and B.M. lived across the hall.  The last day he saw B.M., they went to Wing Park with two friends, Xavier and Vanessa.  Skornia and B.M. then returned to the apartment building and went inside.  Skornia entered his apartment, woke his mother, and gave her a Mother's Day present.

On cross-examination, Skornia testified that he and B.M. were at the park from about 5 p.m. to about 6 p.m.  When they returned home, Skornia did not see defendant.  When the police spoke to him, Xavier, and Vanessa, someone told the police that "there had been a male white teenager who was weird and strange in the park."

Denise Kathleen Bango, Skornia's mother, testified that on May 8, 1997, she was napping in her apartment.  At 6 p.m., Skornia woke her and gave her a Mother's Day present.  B.M. disappeared the same day.

Eugene Lowery, a McHenry County deputy sheriff, testified that Dolan discovered B.M's body about a mile downriver from the Hemmingson Road Bridge.  Several white farmhouses were in the area. B.M. was identified from her dental records.  She was examined at the county morgue on May 18, 1997.  She was wearing jeans with the zipper partially open and underpants turned inside out.

On cross-examination, Lowery testified that no evidence was discovered in the area where B.M. was found.  Although defendant's home and vehicle were searched, B.M.'s shirt was never found.  No tape matching that on B.M.'s neck was found.  The tape on B.M.'s neck contained no evidence.  B.M.'s body and clothing contained no skin, hairs, bite marks, or fluids linking B.M. to defendant.  A couple of days after B.M. was discovered, the temperature of the river was 11 degrees Centigrade.

On redirect examination, Lowery testified that defendant was the prime suspect because he gave a false alibi and stated that B.M. was cold, wet, and "not breathing."

Craig Henderson, a special agent for the Federal Bureau of Investigation (FBI), testified that on May 10, 1997, he searched a blue Lincoln Towncar belonging to Florence Milka, defendant's mother.  Henderson recovered some fabric samples from the car's seats and carpets.  He also recovered a McDonald's cup and lid, which were under some plastic bags on the floor behind the passenger's seat.  The interior of the car was generally unkempt.  The trunk contained a vacuum cleaner and some garbage bags.

Karen A. Lanning, a physical scientist for the FBI, testified that fibers on B.M.'s jeans were consistent with those in the carpets of the Lincoln.  Lanning could not determine when the fibers got onto the jeans.

Melissa Anne Smrz, a supervisory special agent for the FBI, testified that she examined blood on a floor mat of the Lincoln and on the McDonald's cup and lid.  The blood genetically matched that of B.M.  B.M.'s relatives were excluded as sources of the blood.  Smrz could not determine when the blood got onto the mat, cup, and lid.

On cross-examination, Smrz testified that she found no blood or semen in the pubic and rectal areas of B.M.'s jeans and underpants.  She found no semen on a vaginal swab from B.M.

Wendi Howlett (Wendi), B.M.'s mother and defendant's sister, testified that on May 8, 1997, she and B.M. lived in an apartment building in Elgin.  B.M. was 11 years old.  About noon, B.M. had a sandwich, a soda, and a can of fruit cocktail, including diced peaches, pears, and grapes.  About 4 p.m., Wendi and B.M. went to McDonald's.  B.M. had chicken nuggets, french fries, and a drink, and Wendi had a drink as well.  About 5 p.m., B.M. went to Wing Park with her friends.  Wendi left her apartment to visit her sister-in-law and returned about 6:10 p.m.  B.M. was not there, and Wendi believed that she was still at the park.  Wendi began getting ready to go to work.  She and defendant worked together at night, vacuuming and collecting garbage.  That night, they were to meet for work at a factory called W.J. Dennis.  At 6:10 p.m., Wendi did not see defendant or the Lincoln.

Wendi testified that, about 6:30 p.m., B.M.'s friends were outside the apartment building, but B.M. was not.  B.M.'s friends told Wendi that they saw B.M. riding her bicycle toward Wendi's sister-in-law's house.  B.M. was not there, and Wendi called the police.  They arrived about 7:10 p.m., and various friends and family began looking for B.M.  B.M.'s bicycle was found where it was usually kept, in the basement of Wendi's apartment building.  Although Wendi had agreed to meet him at W.J. Dennis, defendant drove the Lincoln to Wendi's apartment building, arriving shortly after 8 p.m.  He saw people gathered in front of the building and asked Wendi what happened.

On cross-examination, Wendi testified that she and defendant worked at W.J. Dennis on May 7, 1997.  After work, they left their cleaning supplies there, and defendant drove Wendi home in the Lincoln.  Among the supplies that remained at W.J. Dennis was the vacuum cleaner that was in the trunk of the Lincoln on May 10.  When defendant arrived at the apartment building on May 8, the backseat of the Lincoln contained a garbage can that was left at W.J. Dennis the night before.  Defendant's clothing did not appear unusual.  He joined the search for B.M.

Wendi testified that, when defendant was very young, their father took them to a railroad museum in Union.  They never went there again.  At trial, defendant was 23 years old.

Wendi further testified that, on May 7, 1997, she, B.M., and defendant took the Lincoln to McDonald's and bought drinks at the drive-through window.  Defendant, who was driving, handed a cup to B.M., who was in the backseat.  The cup looked like the one that the police recovered from the Lincoln.

Glen Theriault, an Elgin police officer, testified that he was dispatched to help look for B.M.  He arrived at Wendi's apartment building about 12:30 a.m. on May 9, 1997.  He was told that defendant was the last person to see B.M.  About 12:45 a.m., Theriault arrived at defendant's house, and defendant exited a house up the street.  Defendant approached, and Theriault asked him where he last saw B.M.  Defendant said that he last saw her leaning against Wendi's car outside her apartment building.  He said later that he saw her sitting on the hood of the car, and he said even later that he saw her on the stoop outside the door of the building.  He said that he had gone to the building to pick up Wendi for work, but Wendi was not there, and he then saw B.M. rollerblading.  He added that B.M. did not enter his car.

On cross-examination, Theriault testified that, when he first saw him, defendant had a beer in his hand.  Theriault noticed nothing unusual about defendant's face or clothing.  After speaking to Theriault, defendant agreed to go to the police station.

James Patrick Picardi, another Elgin police officer, testified that on May 9, 1997, about 1:30 a.m., he was present during an interview with defendant at the police station.  Defendant said that, on May 8, he left his home at 5:45 p.m.  Although he initially intended to go to W.J. Dennis, he decided to drive the Lincoln to Wendi's apartment building.  He arrived there at 6:15 p.m., saw B.M., and asked her where Wendi was.  B.M. replied that Wendi was at the park, looking for her.  Defendant said that Wendi was to meet him at W.J. Dennis.

Picardi testified that defendant told him that B.M. entered the Lincoln, talked to him for a while, gave him a hug and a kiss, and exited the car.  Defendant waited for about 10 minutes as B.M. rode her bicycle up and down the sidewalk.  B.M. then may have taken the bicycle into the building.  Defendant left for W.J. Dennis about 6:30 p.m., stopping at a Speedway gas station at Big Timber and McLean.  He entered the Speedway and bought some cigarettes.  About 7 p.m., he arrived at W.J. Dennis, noticed a car in the parking lot, and decided to return later to begin his work.  Upon returning, he entered and set up his supplies.  He watched a clock for an hour, smoking cigarettes and drinking soda, and Wendi did not appear.  Defendant put his supplies into his car and left about 8:30 p.m., driving toward Americhem, another business where he and Wendi worked.  On the way, something hit his windshield, and he stopped at the same Speedway to wash the windshield.  He went to Americhem, saw that Wendi's car was not there, and continued to Wendi's apartment building, arriving there about 9 p.m.  He was told that B.M. was missing, and he drove through Wing Park, looking for her.  He returned, picked up his sister Dawn, and checked another park.  He then dropped Dawn back at the apartment building and returned to his own neighborhood, where he drank beer and smoked eight or nine "bowls" of marijuana with his friends.  During the interview, defendant produced a bag of marijuana.

On cross-examination, Picardi testified that Theriault told him that defendant was acting strangely and appeared to be intoxicated.  Picardi acknowledged that using marijuana and alcohol may alter one's mental state and skew one's perception of time.  Although he was unclean, defendant's face and clothing were not incriminating.  In the early morning hours of May 9, 1997, defendant consented to a search of the Lincoln.  Picardi saw a garbage can occupying most of the backseat.  The interior was dirty and cluttered.  The exterior had mud in the wheel wells and on the windshield.  The mud on the windshield had been smudged by the wipers.  Defendant's father stated that the mud was not there the previous morning.  Picardi acknowledged that Wing Park was muddy where it was not paved and that defendant said that he drove across an unpaved area.  Near the end of the interview, about 4 a.m., defendant stated that his marijuana use was affecting his memory.

On redirect examination, Picardi testified that he did not believe that defendant was under the influence of alcohol or marijuana.

Don Doran, president of W.J. Dennis, testified that he was in his office at the factory until about 8:10 p.m. on May 8, 1997.  He could see from his office the parking lot in front of the building.  When he left the building, defendant was not inside, and Doran's car was the only one in the front parking lot.  Doran's car was a blue-green Lincoln Towncar.  No other cars were in the front parking lot after 4:30 p.m.  On cross-examination, Doran acknowledged that the building had other parking lots that he did not see.  On redirect examination, Doran stated that the cleaning staff always entered the building through the front entrance.

Robert Michael Beeter, an Elgin police officer, testified that on May 9, 1997, about 3:40 p.m., defendant agreed to show him where he was the night before.  Defendant entered Beeter's car, and Beeter drove as defendant recounted his activities.  His account substantially matched the one that he told at the police station, but he added the following details.  The car that he saw in the parking lot at W.J. Dennis was a white Cadillac.  When that car was gone, he parked in the front parking lot.  After he learned that B.M. was missing, he spent about 20 minutes searching in Wing Park by himself and about 20 minutes searching in the second park with Dawn.  He could not identify where in Wing Park he drove off the paved road.  After he dropped off Dawn, he stayed at Wendi's apartment for a short time and returned to his own neighborhood about 10:30 p.m.  

Beeter testified that "a lot of the things [defendant] told us we proved to be a lie later on."

Valerie Betty, an FBI fingerprint specialist, testified that she compared defendant's palm print to a latent print on the lid of the McDonald's cup that the police found in the Lincoln.  She determined that defendant was the source of the print on the lid.  She could not determine the age of the print on the lid.  She could not state that no one else touched the lid.

Regina Cervantes testified that her house was two or three houses away from defendant's house.  On May 8, 1997, about 10:30 p.m., defendant came to her house and told her that B.M. was missing.  He stated that B.M. had been playing in the park and that he had gone to pick her up.  He further stated that he had told B.M. to wait by the car and that, when he returned, she was gone.  Cervantes testified that defendant was upset and crying but did not appear to be under the influence of alcohol or marijuana.  He stayed in the house until the police arrived at his own house.  He did not smoke any marijuana.

Gustavo Castro testified that, in the afternoon of May 8, 1997, he, defendant, and Ricardo Flores shared two or three marijuana joints.  They did not smoke eight bowls.  About 5:30 p.m., defendant left Castro and Flores at Cervantes' house and planned to meet them there after work.  He returned about 10:30 p.m. and said that B.M. was missing.  He spoke with Cervantes and then watched television with Castro and Flores.  At Cervantes' house, defendant drank one or two beers but did not smoke any marijuana.  He was not under the influence of alcohol or marijuana.  He did not ask for help in looking for B.M.

Flores testified that, at Cervantes' house, defendant stated that he last saw B.M. "sitting on top of the car."  Defendant further stated that he spoke to B.M. and drove away.

Jewel Howlett (Jewel), B.M.'s stepgrandmother, testified that Wendi and B.M. visited her house about 3 p.m. on May 8, 1997.  Each had a drink in a McDonald's cup.  B.M. emptied her cup and left it at Jewel's house.  About 3:45 p.m., as Wendi and B.M. left Jewel's house, Wendi gave her own cup to B.M. and told her that she could finish its contents.  That cup looked like the one that the police recovered from the Lincoln. 

Richard E. Bisbing, vice president and director of research at McCrone Associates, Inc., testified as an expert in forensic microscopy.  He studied a sample of water from the Kishwaukee River and samples of tissue from B.M.'s lung, liver, and rib.  He found diatoms in the river water and similar diatoms in the lung tissue.  He found no diatoms in the liver or the rib.  He concluded that river water was in B.M.'s lungs.

Larry William Blum, a forensic pathologist, testified that he performed an autopsy on B.M.  A piece of tape, 10 to 12 inches long and 3/4 of an inch wide, stretched from B.M.'s right ear, down across her chin, and up toward her left ear.  The airways to her lungs contained hemorrhagic pulmonary edema fluid.  Her stomach contained recently eaten food, including meat like chicken, fruit 

like pear or mixed fruit, and potato, probably french-fried.  B.M. ate that food two or three hours before she died.  Blum found two tears in B.M.'s hymenal ring and other evidence of blunt trauma in her vaginal area.  Her vagina contained a large amount of blood, indicating that the tears occurred "very shortly before death."  The tears were caused by the insertion of an object and were evidence of a sexual assault.

Blum concluded that B.M. died of asphyxia, such as by strangulation, suffocation, or drowning.  However, in light of Bisbing's diatom analysis, Blum doubted that B.M. drowned.  Because Bisbing found no diatoms in the liver or the rib, Blum suspected that the river water entered B.M.'s lungs after she died.  

On cross-examination, Blum testified that he found no evidence indicating who killed B.M.  There was no evidence indicating the precise method of asphyxia.  There was no evidence of injury on B.M.'s neck.  There was little evidence of a struggle.  Alone, Blum's examination could not determine when B.M. died.  Although he doubted it, Blum could not "totally rule *** out" the possibility that B.M.'s hymenal tears were caused by bicycle riding.  He could not determine when B.M. entered the river or whether she was dead at that time.  Unlike blood in B.M.'s nose and mouth, the blood in B.M.'s vagina was not the result of decomposition.

Brian Gorcowski, an Elgin police officer, testified that he spoke to defendant at the police station on May 10, 1997.  Defendant stated that he had lied to the police and that he wanted to tell the truth.  He stated as follows.  On May 8, about 4 p.m., he smoked eight bowls of marijuana with Castro and Flores.  About 5:40 p.m., he went to Wendi's apartment building, arriving there about 6 p.m.  He saw B.M. ride her bicycle up and down the street and then take it into the building.  She then exited the building and sat on Wendi's car.  Defendant motioned to her, and she entered his car.  She told him that Wendi was not home.  He waited until about 6:15 p.m., gave B.M. a hug and a kiss, and went directly to W.J. Dennis.  There he saw a white Cadillac in front, and he did not enter the building because he was under the influence of marijuana and did not want to be seen.  He drove around and finally parked in the lot east of the building, waiting for the Cadillac to leave.  Gorcowski's partner told defendant that a surveillance video may have shown that his car was not in that parking lot, and defendant replied that he did not park there.  Defendant stated that he entered the building about 8:15 p.m., when the Cadillac was gone.  He stayed for about 50 minutes but did not work.

Gorcowski testified that defendant next stated that he began driving back to Wendi's apartment building and that mud hit his windshield.  He stopped to clean the windshield at the Speedway on Big Timber.  Although he had stopped at the Speedway earlier in the day, he had not gone inside to buy cigarettes.  He did not explain why he had stopped.  He stated that he arrived at Wendi's building about 9:10 p.m., that he looked for B.M. in Wing Park, that he and Dawn looked for her in another park, and that he arrived at Cervantes' house about 11 p.m.  There he drank some beer and smoked more bowls of marijuana.

Gorcowski next testified to what defendant would call his "vision statement."  Gorcowski testified that he told defendant that, because he was the last to see B.M., he could be "connected" to her.  Gorcowski asked him to "imagine" where she was.  Defendant closed his eyes, rubbed his temples, and stated that B.M. was close, that she was near Elgin, and then that she was in Elgin.  Gorcowski asked what she was doing and how she felt, and defendant began to cry, saying that B.M. was cold and wet and was not breathing.  Defendant then asked for a cigarette, and Gorcowski escorted him outside, where defendant smoked a cigarette and paced back and forth, shaking his hands and mumbling.  He said that he saw two Hispanic males driving a gray Oldsmobile and drinking Budweiser.  They were touching B.M. but not trying to have sex with her.  Defendant then resumed crying and said that he wanted to tell Wendi that he knew that B.M. was dead.  At that point, defendant hugged Gorcowski for about a minute.

Gorcowski testified that he and defendant went back inside.  On defendant's request, Gorcowski called Wendi, who agreed to come to the station.  Before she arrived, defendant again closed his eyes and rubbed his temples.  He said that he saw a white farmhouse and farmland, a bridge, rocks, water, a creek, a dirt road, and a  gravel road.  He again mentioned that male Hispanics were touching B.M. and then that B.M. was not breathing but did not drown.  She was not sexually assaulted.  Wendi arrived and spoke with defendant privately for about three minutes.  Defendant then told Gorcowski that he was just having "visions" and that B.M. was not really dead.  Gorcowski testified that defendant did not appear to be under the influence of alcohol or drugs.

Chris Troiola, an Elgin police officer, testified that he obtained the Speedway's surveillance tape from May 8, 1997.  The parties stipulated that the tape would show that defendant did not enter the Speedway on that date.

Neal Haskell, a forensic entomologist, examined samples of insect larvae and eggs taken from B.M.'s body during her autopsy.  Based on their development and the conditions to which B.M.'s body was exposed, Haskell concluded that B.M. died sometime before the late afternoon of May 9, 1997.  On cross-examination, Haskell acknowledged that his opinion was based on some speculation.  Nevertheless, his opinion was within a reasonable degree of scientific certainty.

The parties stipulated that B.M. was born in February 1986 and that defendant was born in June 1976.  They further stipulated that John Kenney, a forensic odontologist, would testify that he positively identified B.M.'s body.  "[T]o avoid possible confusion on jury deliberation," the State nol-prossed counts II, IV, and V.  The State rested, and the court denied defendant's motion for a directed verdict.

Defendant produced the following evidence relevant to our analysis.  Ronald E. Menold II, a forensic chemist for the FBI, testified that he compared the tape on B.M.'s neck to a tape in the Lincoln.  He concluded that the tapes were different.

Florence Milka (Florence), defendant's mother, testified that defendant lived with her throughout his life.  On May 8, 1997,  she drove the Lincoln to work about 8 a.m. and returned home about 5:15 p.m.  About 5:45 p.m., defendant drove the Lincoln to work.  At no time did the car contain a garbage can.  About 7:45 p.m., Wendi called and told Florence that B.M. was missing.  Florence's daughter Tracey drove her to Wendi's apartment building.  Defendant arrived there in the Lincoln about 8:15 p.m.  He was surprised to learn that B.M. was missing, and he joined the search.  On the morning of May 9, mud was in the wheel wells of the Lincoln, and a garbage can was in the car.

Florence testified that defendant was a slow learner who had extreme difficulty reading and writing.  He had trouble understanding conversations and could not manage a bank account.

Florence stated that, when defendant was about two years old, Florence and her husband took their children to a railroad museum in Wisconsin.  They never took them to the museum in Union.

Florence testified that B.M. had frequent nosebleeds.  About two weeks before she disappeared, she had a nosebleed in the backseat of the Lincoln.  Florence did not subsequently clean the car's carpets.  On May 10, 1997, Florence told members of her family, including defendant, that a psychic envisioned that B.M. was dead and was cold, wet, and near a bridge in a wooded area.  She did not remember the psychic mentioning a farmhouse or farmland.  Defendant subsequently was questioned at the police station.

Scott Howlett (Scott), Wendi's husband, testified that defendant had a simple vocabulary and needed assistance with basic tasks.  He was not retarded but was "a little slower."  Nevertheless, he obtained a driver's license, graduated high school, and held jobs.  He was a very good babysitter for B.M.

Steven Dunton, a forensic pathologist, testified that he  reviewed all the materials in this case.  He determined that B.M.'s hymenal tears could have occurred at the time of death or up to two days before.  The tears suggested penetration by an object but could have been caused accidentally.  The blood in B.M.'s vagina was partially the result of decomposition.  The food in her stomach was eaten one to two hours before her death.  Because the fruit was largely intact, Dunton did not believe that B.M. ate it several hours before the other foods.  Because the meat was not breaded, Dunton did not believe that it was a McDonald's chicken nugget.  Dunton concluded that B.M. drowned.  He was not certain that B.M. was the victim of a homicide.  He could not determine precisely when she died, though she likely died no later than May 15, 1997.  Dunton further stated, however, that she likely died on the day that she disappeared, unless the food in her stomach was eaten on a later day.

On cross-examination, Dunton acknowledged that he was not present at B.M.'s autopsy and that he was relying on photographs and Blum's report.  He further acknowledged that Blum was in a better position to evaluate B.M.

Dawn Milka (Dawn), defendant's sister, testified that early in 1997 she had to help defendant complete a job application because he did not understand terms like "employed" and "work history."  Dawn needed to help defendant spell certain words.  Dawn read to defendant a second job application, and again he did not understand certain words.  On May 8, 1997, Dawn arrived at Wendi's home about 8:10 p.m., and defendant was there.  In the Lincoln, defendant drove Dawn to McDermott Park, where they searched for B.M.  Defendant drove erratically.  A garbage can was in the backseat of the car.  In the park, defendant drove through some mud, and Dawn noticed that defendant's eyes were moving in a way that made him look "stoned."  His appearance was otherwise normal.  When defendant left Wendi's home, he said that he was going to get a jacket and would be back.  Dawn testified that the psychic to whom Florence had referred had mentioned a white farmhouse.

Nancy Kopsell, a waitress at a restaurant in Woodstock, testified that on May 10, 1997, about 7:30 p.m., she waited on a young girl and a "man that was very unkempt looking."  They were in the restaurant for about an hour, and the girl never looked up or spoke.  The man ordered for the girl a child's meal of chicken, french fries, and a slice of watermelon.  Kopsell thought that the girl was B.M.

On cross-examination, Kopsell testified that at one point the man went to the bathroom, leaving the girl alone.  The girl did not leave the restaurant, make a phone call, or ask Kopsell for help.  Kopsell was about "70 percent" sure that the girl was B.M.  Kopsell never saw the color of the girl's eyes because the girl kept her head down.

Richard Allen Buendorf, Jr., a private investigator, testified that it took him about 30 minutes to drive from Wendi's home to the Hemmingson Road Bridge.  It took him an additional four minutes to drive to the area where B.M. was found.  He had driven several times in that area.

Wendi testified that the fruit in B.M.'s stomach looked bigger than the fruit in the cocktail that B.M. ate about noon on May 8, 1997.  B.M. did not eat any chicken or french fries at that time.  She did not eat any fruit later that day.

Wendi added that defendant had difficulty performing tasks without supervision.  He could not read stories to B.M. or manage a bank account.

Robert D. Hall, a forensic entomologist, testified that he  examined the samples that Haskell reviewed.  Hall obtained new information about the conditions in which the samples were stored from May 19 to May 21, 1997.  In light of that information, Hall concluded that one specimen was deposited on B.M.'s body as late as May 12.

The State moved to bar Young's testimony as cumulative.  The court and defense counsel had the following discussion:

"MR. KOMIE [defense counsel]: Judge, it's not cumulative because [Young] is a coroner. ***

THE COURT: He's not a forensic pathologist.

* * *

THE COURT: His testimony will be stricken.

***

THE COURT: I'll find that it's cumulative. ***

* * *

MR. KOMIE: May I make an offer of proof of the original report of Dr. Young and also [his] addendum ***?

THE COURT: Yes.

* * *

MR. KOMIE: And *** I would say if Dr. Young were called to testify, he would testify that the first report was made; that, secondly, when new information came to light and he learned from Dr. Hall that the postmortem interval had been changed, he recalculated the information himself and reached an opinion to a reasonable degree of medical certainty, which is reflected in the addendum that was dated yesterday when the information became available from Dr. Hall.  

THE COURT: My point is that his opinion is exactly the same as Dr. Hall's.  That's my point, and that makes it cumulative.

I guess I made my ruling."

In his addendum, Young adopted Hall's "date of colonization of May 12, 1997."  Young also stated a conclusion as to the cause of B.M.'s death.

Kent D. Kryzan testified that, on the morning of May 12, 1997, he was traveling to work in Union.  The temperature was about 35 degrees.  A dark green car was parked to the side of a bridge over the Kishwaukee River.  A man wearing only a bathing suit was running toward the river.  His hair was long but not unkempt.  He may have been Hispanic.  Kryzan saw nothing indicating that the man was connected to B.M.  

Susanne Buchek, who was in the car with Kryzan, testified similarly.  She added that the green car was parked on a bridge close to where B.M. was found.

Maureen Lee Shefcik (Maureen) testified that she owned a landscaping business in Union.  In May 1997, she had an employee named Julio C. Garcia, who lived in Elgin and had worked for her for about a month.  He did not come to work on May 8 or May 9.  In June 1997, he left Maureen's employ, and Maureen never saw him again.  Referring to the area where B.M. was found, Maureen stated that one would dispose of a body there only if he "knew that it was very secluded."  David J. Shefcik, Maureen's husband, testified that Garcia had a drinking problem.

Frances Britton, a resident of Marengo, testified that on May 8, 1997, about 6:30 p.m., she was driving past a local building that housed a lot of Hispanic workers.  B.M. was sitting on the porch, smiling.  Hispanic men were standing around B.M.  Britton did not see defendant.

Maureen Bottrell, a forensic geologist for the FBI, testified that she compared soil samples from the Lincoln, Wing Park, and the area of the Hemmingson Road Bridge.  The samples from the Lincoln were consistent with those from Wing Park and were inconsistent with those from the area of the Hemmingson Road Bridge.  On cross-examination, Bottrell testified that the samples from the area of the Hemmingson Road Bridge consisted more of asphalt and foliage than of soil.  A car would accumulate less soil in an area  containing less soil.  Furthermore, if the car traveled 20 miles on paved roads, any accumulated soil would likely fall from the car.  Bottrell acknowledged that "a lack of soil evidence does not mean that you weren't there."

Sharon Marshall testified that she lived near B.M. through 1996.  Once in May or June of 1996, an Hispanic man followed B.M. around and made her nervous.  Bottrell never saw the man again.  Michael Kedziora, Marshall's boyfriend, testified that the man was wearing a jacket that was found nearby the next day.  The jacket contained a butter knife and a screwdriver.

Larry Stotts, a resident of Elgin, testified that he organized a search for B.M.  Beeter testified that he interviewed Stotts on May 29, 1997.  Beeter learned that Stotts murdered a woman more than 20 years earlier and subsequently spent 10 years in a mental institution.  On cross-examination, Beeter testified that Stotts was "absolutely ruled out" as a suspect in this case.

The parties stipulated that Michael Steger, a resident of  B.M.'s apartment building, would testify that on May 8, 1997, in the late afternoon, he saw B.M. sitting on Wendi's car.  He did not see any other person or vehicle nearby.

In rebuttal, the State produced the following evidence.  Beeter testified that on May 20, 1997, Wendi told him that on May 8, about 2 p.m., B.M. ate a bowl of whole peaches.  Those peaches were in addition to the fruit cocktail that B.M. ate about noon.

Lowery testified that on August 15, 1997, Florence told him that in March 1997 B.M. had a nosebleed in the front passenger seat of the Lincoln.  She added that the vehicle was "cleaned out" before May 8.  She did not have to remove any bloodstains.  Lowery further testified that on June 9, 1997, Wendi told him that, when she was a child, her family spent several weekends at the railroad museum in Union.  Lowery added that on August 15, 1997, Wendi told him that B.M. was last in the Lincoln on May 2 or May 5.  Wendi did not say that she, B.M., and defendant went to McDonald's on May 7.  On December 19, 1997, Wendi told the police that she could not explain how defendant's palm print and B.M.'s blood got onto the McDonald's cup and lid, but she said that the cup was the one from the last meal that she had with B.M. on May 8.  She never mentioned a psychic.

On cross-examination, Lowery testified that Wendi never saw the McDonald's cup.  Florence told him that she was not sure that B.M. had the nosebleed in the front passenger seat.  She added that she had trouble keeping the Lincoln clean because defendant frequently left "fast food trash" in it.  She noted that defendant's favorite restaurant was Burger King.  On redirect examination, Lowery testified that the police found only one McDonald's cup in the Lincoln.

W. Jeffrey Bassett, a special agent for the FBI, testified that on May 9, 1997, Wendi told him that on May 8 she first saw defendant when he arrived at her home about 9 p.m.

The State rested, and the court denied defendant's motion for a directed verdict.  The court issued the following jury instructions, among others:

"To sustain the charge of First Degree Murder, Felony Murder, the State must prove the following propositions:

The first proposition, that the defendant performed the act which caused the death of [B.M.]; and 

Second proposition, that when the defendant did so he was committing the offense of predatory criminal sexual assault of a child.

* * *

[To prove that] the defendant was committing the offense of Predatory Criminal Sexual Assault of a Child, the State must prove the following propositions:

The first proposition, that the defendant committed an act of sexual penetration upon [B.M.]; and 

Second proposition, that the defendant was 17 years of age or older and that [B.M.] was under the age of 13 years of age when the act was committed."

The jury acquitted defendant on count I (knowing murder) but convicted him on count III (felony murder).  The court denied defendant's posttrial motions.

A presentence investigation revealed that defendant had no criminal record.  He graduated high school and was working two jobs before his arrest.

At sentencing, the State submitted no evidence in aggravation.  Defendant called Alan Ravitz, a psychiatrist who evaluated him.  Ravitz testified that defendant was functionally illiterate, did not exhibit signs of sociopathy, and was the functional equivalent of an 11-year-old.  Although his IQ was at the borderline, functionally he was mentally retarded.  He was unable to live independently or hold down jobs.  He likely suffered from attention deficit hyperactivity disorder, social phobia, substance abuse problems, and a learning disability.  He was impulsive and unable to form and implement a complex plan.  He had aggressive tendencies and low frustration tolerance.

On his own and Wendi's behalf, Scott presented a victim impact statement.  Scott stated that he and Wendi had a "constant belief in [defendant's] innocence."

Because B.M. was less than 12 years old (730 ILCS 5/5--5--3.2(b)(4)(i) (West 1996)), the court sentenced defendant to an extended term of 75 years' imprisonment (730 ILCS 5/5--8--2(a)(1) (West 1996)).  The court denied defendant's motion for reconsideration.

Defendant moved for the payment of Young's fees, asserting that Young was involved in the case for 120 hours at an hourly rate of $100.  Defendant attached Young's accounting of those hours, detailing the services that he performed.  Defendant requested that Young be paid $7,000 in fees, which consisted of an incurred total of $12,000 less the $5,000 retainer that he received.  The court stated that it had "some disagreement with the number of hours that would be reasonable."  The court awarded $3,000 in fees, finding that sum to be "fair and reasonable."  

Defendant appealed, and Young filed a supplemental appeal.

II. DEFENDANT'S APPEAL

A. Double Jeopardy

First, defendant argues that, when the State nol-prossed count IV, which charged him with predatory criminal sexual assault of a child, he was functionally acquitted of that offense.  Thus, defendant asserts, the principle of double jeopardy (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10) precluded further proceedings on count III, the felony-murder count, which was predicated on predatory criminal sexual assault of a child.  Defendant concludes that his conviction on count III must be reversed.  The trial court rejected this argument, but the issue is legal and our review is 
de novo
.  See 
People v. Johnson
, 304 Ill. App. 3d 599, 601 (1999).

Once a defendant has been acquitted of an offense, double jeopardy prohibits a second prosecution for that offense.  
People v. Bellmyer
, 199 Ill. 2d 529, 537 (2002).  Furthermore, a "[
nolle-prosequi
] after jeopardy attaches has the same effect as an acquittal."  
People v. Daniels
, 187 Ill. 2d 301, 312 (1999).  Thus, if a count is nol-prossed after jeopardy has attached, the State may not reinstate that count in the same or a subsequent trial.  
People v. Blake
, 287 Ill. App. 3d 487, 491-92 (1997).

Here, the State nol-prossed count IV after jeopardy had attached, as jeopardy had attached when the jury was empaneled and sworn.  
Bellmyer
, 199 Ill. 2d at 538.  However, the State did not reinstate count IV; it merely proceeded on count III, the felony-murder count based on the predicate offense that count IV had separately charged.  Nevertheless, defendant asserts that, because he was "acquitted" of the predicate offense, the felony-murder count was foreclosed on the basis of collateral estoppel. 

We acknowledge that collateral estoppel is a component of double jeopardy.  
People v. Carrillo
, 164 Ill. 2d 144, 151 (1995). We further note that, on that basis, an acquittal of a predicate felony may preclude subsequent proceedings on a charge of felony murder.  In 
Carrillo
, for example, the trial court acquitted a defendant of armed robbery, finding "that there was reasonable doubt that [she] had the requisite intent."  
Carrillo
, 164 Ill. 2d at 152.  The supreme court determined that the acquittal foreclosed a felony-murder count based on armed robbery.  Similarly, in 
People v. Harris
, 132 Ill. 2d 366 (1989), the trial court directed a verdict on an armed robbery charge, finding the evidence insufficient to support it.  The supreme court determined that the directed verdict constituted an acquittal and that the armed robbery "could not later serve as a predicate for felony murder."  
Harris
, 132 Ill. 2d at 392.

The difference here, of course, is that the "acquittal" was the result of a 
nolle-prosequi
, rather than a lack of sufficient evidence.  In essence, defendant asserts that an acquittal is an acquittal.  On these facts, however, we disagree.  We believe that the State's 
nolle-prosequi
 of count IV did not prevent it from proceeding on count III.

These facts are novel in Illinois, but we find highly persuasive a Maryland case, 
Williams v. State
, 50 Md. App. 255, 437 A.2d 665 (1981).  There, at the end of an initial trial, the State nol-prossed an attempted robbery charge.  A mistrial occurred when the jury failed to reach a verdict.  At a second trial, the court instructed the jury that the attempted robbery charge could serve as the predicate for felony murder.  The defendants were convicted of felony murder, and they appealed, arguing that their convictions violated double jeopardy.

The Court of Special Appeals noted that the defendants' argument "by necessity rests upon the collateral estoppel" component of double jeopardy.  
Williams
, 50 Md. App. at 261, 437 A.2d at 669.  The court went on to explain the relevant distinction between an acquittal for insufficient evidence and an "acquittal" resulting from a 
nolle-prosequi
:

"[U]nlike an acquittal *** for insufficient evidence, a dismissal by [
nolle prosequi
] terminates the action prior to a decision on the merits, and ends the case without an adjudication of the disputed facts necessary to render a judgment on the merits. ***

*** [F]or collateral estoppel to apply, the prior determination must have been on its merits.  Although when the [
nolle prosequi
] was entered *** it served as an acquittal [citation] for purposes of a subsequent reprosecution [citation], it nevertheless terminated the cause without an adjudication of the disputed facts: 
i.e.
, there had been no determination whether the [defendants] committed the offense alleged.  Except for purposes of reprosecution, however, it does not preclude a factfinding determination of the ultimate fact at issue, which may be determined only once ***."  (Emphasis omitted.)  
Williams
, 50 Md. App. at 261-62, 437 A.2d at 669-70. 

The court concluded that, because the 
nolle-prosequi
 of the attempted robbery charge did not constitute "an adjudication on the merits of that ultimate fact [citation], it was not improper to submit the felony murder charge to the jury predicated upon its preliminary determination of facts not theretofore decided.  It did not constitute a violation of the double jeopardy prohibition."  
Williams
, 50 Md. App. at 262, 437 A.2d at 670.

We find the reasoning of 
Williams
 unassailable.  As the court noted, collateral estoppel bars the relitigation of an issue only if the issue was previously litigated to a judgment on the merits.  
People v. Jones
, 301 Ill. App. 3d 608, 610 (1998).  In 
Carrillo
 and 
Harris
, the defendant was found not guilty
 of the predicate offense, and the defendant's guilt of that offense could not be relitigated in the context of the felony-murder charge.  Here, however, the State's 
nolle-prosequi
 of count IV "[did] not actually acquit" defendant of the predicate offense (
Daniels
, 187 Ill. 2d at 319), and the State was free to submit that issue to the jury for resolution under count III.  There had been no prior resolution on the merits, and collateral estoppel did not apply.

As the 
Williams
 court observed, "double jeopardy protection is a constitutional shield, not a procedural weapon.  The primary need for that shield is to ward off a second thrust after acquittal by the trier of facts."  (Emphasis omitted.)  
Williams
, 50 Md. App. at 261, 437 A.2d at 669.  Furthermore, our own supreme court has noted that double jeopardy principles "should not be applied mechanically when the interests they protect are not endangered and when their mechanical application would frustrate society's interest in enforcing its criminal laws."  
People v. Knaff
, 196 Ill. 2d 460, 468-69 (2001).  Here, defendant submits precisely that kind of application.  The State did not reinstate the charge that it had nol-prossed, nor did it attempt to convict defendant when he had already been acquitted as a matter of fact.  Thus, double jeopardy concerns are not implicated here, and we reject defendant's mechanical argument to the contrary.

B. Reasonable Doubt: Identity

Second, defendant argues that the State failed to prove, beyond a reasonable doubt, that he was the person who caused B.M.'s death.  
He asserts that, at most, the State proved that he had the opportunity to commit the crime.  Thus, he concludes, his conviction must be reversed.

In evaluating an attack on the sufficiency of the evidence, we do not retry the case.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).  Instead, we defer to the jury's determinations of the credibility of the witnesses, the weight of their testimony, and the reasonable inferences from the evidence.  
People v. Steidl
, 142 Ill. 2d 204, 226 (1991).  We must deem the evidence sufficient if, viewing it in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Perez
, 189 Ill. 2d 254, 265-66 (2000).  A conviction may be sustained only if the evidence sufficed to show that the defendant committed the crime.  
People v. Rodriguez
, 312 Ill. App. 3d 920, 933 (2000).

Again, defendant concedes that, "as the last person known to have seen [B.M.] alive," he had the opportunity to commit the crime.  We acknowledge that 
"an opportunity to commit a crime is not enough to sustain a conviction unless the State can show that no one else had the opportunity."  
People v. Lovelace
, 221 Ill. App. 3d 20, 24 (1991).
  However, the State presented additional evidence that linked defendant to the crime.

First, the State demonstrated that defendant lied to the police about his activities on the night of May 8, 1997.  Defendant points out that his accounts, though inconsistent, were exculpatory, but the State correctly responds that a false exculpatory statement is "probative of a defendant's consciousness of guilt."  
People v. Shaw
, 278 Ill. App. 3d 939, 951 (1996).

Attempting to neutralize the inconsistencies in his statements, defendant relies primarily on 
Lovelace
.  There, the defendant was convicted of murdering Green.  The State's theory was that the defendant committed the crime when Green visited the defendant's house.  The defendant told the police that Green had left his house alive, but his accounts "varied as to exactly how Green left defendant's home that night.  The accounts ranged from Green walking away alone to Green getting into a large dark-colored car."  
Lovelace
, 221 Ill. App. 3d at 23.  In reversing the conviction, we determined that "[t]he story was substantially the same each time it was told.  While suspicious, these inconsistencies are minor when the evidence as a whole is viewed."  
Lovelace
, 221 Ill. App. 3d at 24.

In 
Lovelace
, despite their variety, the defendant's accounts consistently defeated the critical aspect of the State's theory: that the defendant killed Green during Green's visit to his house.  Here, by contrast, the critical aspect of the State's theory was that defendant killed B.M. between the time that he left Wendi's apartment building, about 6:15 p.m., and the time that he returned, which he identified as about 9 p.m.  Thus, defendant's whereabouts during that period were absolutely crucial, and defendant never gave a consistent explanation on that point.

He told Picardi that, upon leaving Wendi's building, he stopped at the Speedway and went inside to buy cigarettes, but he told Gorcowski that he went directly to W.J. Dennis.  He consistently stated that he saw a white Cadillac in front of W.J. Dennis, but Doran testified that no such car was there.  Defendant told Gorcowski that he parked in the lot east of the building, but, upon being told of a surveillance video, he recanted that statement.  He told Picardi that he entered W.J. Dennis about 7:30 p.m., but he told Gorcowski that he entered about 8:15 p.m.  That difference was important, as Doran testified that defendant was not in the building when he left about 8:10 p.m.  Finally, defendant told Picardi that, after leaving W.J. Dennis, he looked for Wendi at Americhem; but he told Gorcowski that, on his way back to Wendi's building, he stopped only at the Speedway.

To be sure, defendant's statements contained some inconsistencies that indeed were insignificant.  For example, defendant gave multiple answers when Theriault asked him where he had last seen B.M.  Those inconsistencies, though suspicious, did not bear on a critical issue.  The deviations noted above, however, dealt directly with defendant's alibi, and a false alibi, when viewed along with other evidence, can establish guilt beyond a reasonable doubt.  See 
People v. Martin
, 80 Ill. App. 3d 281, 297 (1979).

Next, the State submitted defendant's "vision statement," which contained an eerily accurate description of the location where B.M.'s body was found.  He stated that B.M. was cold and wet and was not breathing, and he further stated that she was near a white farmhouse, farmland, and a bridge.  On appeal, defendant claims that the accuracy of his description could have been merely coincidental, that he "could simply have been picturing a rural site in his mind."  He further points out that he produced evidence suggesting that he simply repeated the readings of a psychic.  However, though these could have been reasonable explanations for his statement, it was up to the jury to accept or reject them.  A jury is not required to accept a reasonable hypothesis of innocence and elevate it to the status of reasonable doubt.  
People v. Earl
, 104 Ill. App. 3d 846, 850 (1982).  Certainly, the jury was entitled to determine that defendant's statement was accurate because he had personal knowledge of B.M.'s location.

The State further relied on the floor mat containing B.M.'s blood and on the cup containing defendant's palm print and B.M.'s blood.  On appeal, defendant asserts that this evidence was not tied to the time of the crime.  Although Jewel testified that Wendi gave B.M. a similar cup about 3:45 p.m. on May 8, defendant argues that the cup in the Lincoln "could have been in the car for a considerable time."  Furthermore, as to the blood, defendant submits that B.M. "could have had a nosebleed while in the Lincoln sometime prior to May 8."  Again, these are nothing but reasonable hypotheses that the jury was empowered to reject.  Clearly, the jury rationally could have inferred that the cup in the Lincoln was the one that B.M. had possessed on May 8 and that the blood in the Lincoln was the result of the crime.

Defendant responds that, according to Blum, the blood from B.M.'s hymenal tears was contained in her vagina.  Defendant further notes that Smrz found no blood in B.M.'s underpants or jeans.  Thus, defendant concludes, the State did not explain how the blood could have gotten into the Lincoln.

Defendant's view of the evidence is overly narrow.  When B.M. was found, her underpants were inside out, suggesting strongly that she was not wearing her underpants or her jeans when her wounds were inflicted.  Furthermore, Blum testified that the wounds were caused by the insertion of an object.  The jury clearly could have inferred that the object, once removed, would have been bloody.  Thus, the evidence sufficed to show how blood appeared in the Lincoln but not in B.M.'s underpants or jeans.

Finally, defendant contends that the State's scientific evidence did not establish that B.M. died during the theorized period.  It is true that, in reviewing the entomological evidence, Haskell testified that B.M. could have died as late as the afternoon of May 9.  However, Blum testified that, two or three hours before she died, B.M. ate what appeared to be chicken, mixed fruit, and french-fried potato.  Wendi testified that, about 4 p.m. on May 8, B.M. ate chicken nuggets and french fries.  Although Wendi testified that B.M. ate mixed fruit a few hours earlier, we cannot determine that the jury was precluded from inferring that the meat and potatoes in B.M.'s stomach were those she had eaten about 4 p.m.  That inference placed the time of her death squarely within the period theorized by the State.  

Defendant suggests that, because "[a] meal of chicken, French-fried potatoes and fruit is certainly not unusual for a child," B.M. could have eaten it and died on a later day.  Once again, however, the evidence allowed the jury to reject that hypothesis.

We note that, though we have indulged him, "defendant seeks in his argument to segregate each piece of evidence and locate the doubt therein.  That approach is improper."  
Martin
, 80 Ill. App. 3d at 297.  When the evidence is circumstantial, the jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances.  The evidence is sufficient if all of it, taken together, satisfies the jury that the defendant is guilty beyond a reasonable doubt.  
People v. Hall
, 194 Ill. 2d 305, 330 (2000).

Here, viewed in the light most favorable to the State, the evidence allowed the jury to find the following facts: (1) defendant was the last known person to see B.M. alive; (2) B.M. died between 6 p.m. and 9 p.m. on May 8, 1997; (3) defendant lied to the police about his whereabouts during those hours; (4) the blood in defendant's car was the result of B.M.'s hymenal tears; and (5) defendant accurately described the location of B.M.'s body.  Defendant submitted evidence to counter or explain each of these findings.  However, the question is not whether a rational jury could have acquitted defendant; the question is whether a rational jury could have convicted him.  Clearly, the evidence was sufficient to allow the jury to find, beyond a reasonable doubt, that defendant caused B.M.'s death.

C. Reasonable Doubt: Felony Murder

Third, defendant argues that the State failed to prove, beyond a reasonable doubt, that he was guilty of felony murder.  He asserts that the evidence failed to establish a sufficient link between B.M.'s death and the predicate felony, predatory criminal sexual assault of a child.

Section 9--1(a)(3) of the Criminal Code of 1961 (the Code) states:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

* * *

(3) he is attempting or committing a forcible felony other than second degree murder."  720 ILCS 5/9--1(a)(3) (West 1996).

The elements of felony murder under section 9--1(a)(3) are (1) that the defendant was a participant in a forcible felony; and (2) that the victim was killed during the commission of the felony as a direct and foreseeable consequence of it.  
People v. Burke
, 85 Ill. App. 3d 939, 941 (1980).  Predatory criminal sexual assault of a child is a forcible felony.  720 ILCS 5/2--8 (West 1996).

Here, defendant concedes that the sexual assault "occurred close in time to the death," but he contends that, "[f]or all the record shows, the sexual assault and the death were the result of two separate and unrelated acts or sets of acts."  In our view, however, the evidence sufficed to support the jury's verdict.

In 
People v. Todd
, 154 Ill. 2d 57 (1992), the decedent was found nude except for a blouse tied around her neck and intertwined with a necklace.  Her clothing, which was nearby, included a torn bra and a pair of jeans turned inside out.  According to a pathologist, the primary cause of death was strangulation.  The defendant was charged with felony murder predicated on attempted aggravated criminal sexual assault.  After a bench trial, the trial court looked at " 'the total set of circumstance' " and convicted the defendant.  
Todd
, 154 Ill. 2d at 66.  On appeal, the supreme court determined "that the trial court, as the rational trier of fact, could have found, beyond a reasonable doubt, that the defendant murdered the victim while in fact attempting aggravated criminal sexual assault."  
Todd
, 154 Ill. 2d at 74.

A similar conclusion is warranted here.  B.M. was found nude from the waist up except for a piece of tape stretched from her right ear, across her chin, and toward her left ear.  Her jeans were partially unzipped, and her underpants were inside out.  Her vagina contained a large amount of blood, indicating that, as Blum testified, the sexual assault had occurred "very shortly before death."  Blum further testified that B.M. had been asphyxiated, but he did not believe that B.M. had drowned.  These circumstances clearly allowed the jury to reject defendant's claim that the sexual assault and the death were "unrelated."  As in 
Todd
, the jury rationally could have concluded that defendant killed B.M. while committing the sexual assault.

Defendant relies on two cases that are distinguishable.  In 
People v. Benson
, 19 Ill. 2d 50 (1960), the defendant had sexual intercourse with the victim, who died soon after.  According to the doctor who performed the autopsy, the victim died primarily from "sexual assault with recent brain damage."  
Benson
, 19 Ill. 2d at 59.  The supreme court reversed the defendant's murder conviction, noting the lack of evidence that he had caused the brain damage. 

Similarly, in 
People v. Martin
, 26 Ill. 2d 547 (1963), the defendant allegedly committed a sexual assault, and the victim died the next day.  According to the pathologist who performed the autopsy, the victim died from "Boeck's sarcoidosis of the lungs, liver and spleen, (a disease comparable in some respects to tuberculosis,) 'contributed to and aggravated by lacerations of the anus and rectum, with infection.' "  
Martin
, 26 Ill. 2d at 548.  The supreme court reversed the defendant's murder conviction, noting that "there was neither satisfactory nor logical explanation how such comparatively minor injuries to non-vital organs such as the anus and rectum could have had a terminal result."  
Martin
, 26 Ill. 2d at 550.

In 
Benson
 and 
Martin
, the evidence did not permit the inference that the defendant killed the victim during a sexual assault.  Indeed, the former defendant apparently did nothing to cause his victim's brain damage, and the latter apparently did nothing to cause his victim's Boeck's sarcoidosis.  Here, by contrast, there was nothing irrational about the jury's finding that defendant asphyxiated B.M. during a sexual assault.  Under the circumstances, that finding was fully justified.

D. "Vision Statement"

Fourth, defendant argues that the court erred in admitting his "vision statement" as an admission.  He asserts that the statement "cannot fairly be taken to give rise to an inference of guilt."  We  disagree.

Preliminarily, the parties disagree about both the definition of an admission and our standard of review.  In 
People v. Stewart
, 105 Ill. 2d 22, 57 (1984), the supreme court determined that an admission is a statement "from which guilt may be inferred, when taken in connection with other facts, but from which guilt does not necessarily follow."  However, in 
People v. Aguilar
, 265 Ill. App. 3d 105, 111 (1994), the Third District of the Appellate Court suggested that "any and every statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission."

In 
People v. Rodriguez
, 291 Ill. App. 3d 55, 61 (1997), this court followed the supreme court's definition, and we will continue to do so until that court provides further guidance.  See 
People v. Ervin
, 297 Ill. App. 3d 586, 590 (1998).

As to the standard of review, the general rule is that a trial court's evidentiary ruling is reversible only if the court abused its discretion.  On the other hand, when an evidentiary ruling turns on a question of law, our review is 
de novo
.  
People v. Hall
, 195 Ill. 2d 1, 20-21 (2000).  Defendant asserts that the 
de novo
 standard applies because "the pertinent facts" concerning his statement were undisputed.  However, the issue is whether the trial court properly found that the statement, "when taken in connection with other facts," allowed an inference of guilt.  
Stewart
, 105 Ill. 2d at 57.  Thus, because the issue required an assessment of all the facts of the case, the trial court's ruling was discretionary, and we will review it only for abuse.  See 
People v. Gonzalez
, 231 Ill. App. 3d 1071, 1076 (1992).

Defendant relies primarily on 
Rodriguez
, where the defendant was charged with crimes stemming from his alleged firing of a gun.  A witness testified that he asked the defendant whether he had fired the gun and that the defendant replied, " 'I am a sharp shooter.' "  
Rodriguez
, 291 Ill. App. 3d at 60.  We held that the reply was not an admission.

In 
Rodriguez
, the defendant simply stated that he was a  " 'sharp shooter' "; that statement did not carry the implication that he was 
the
 shooter who had committed the crimes.  Here, the situation is different.  Defendant stated that B.M. was cold and wet and was not breathing, and he further stated that she was near a white farmhouse, farmland, and a bridge.  It is true that, as he contends, "he did not admit to any involvement in [B.M.'s] disappearance, any more than Rodriguez had admitted firing a gun."  However, when defendant's statement was coupled with the fact that B.M. 
was
 cold and wet and was not breathing, and 
was
 near a white farmhouse, farmland, and a bridge, the statement allowed the inference that he had personal knowledge of B.M.'s location and thus in fact was involved in her disappearance.  Thus, though defendant did not actually admit guilt, his statement was still an admission.  See 
Stewart
, 105 Ill. 2d at 57 (statement may be admission though guilt does not necessarily follow therefrom).

Defendant further suggests that, because Gorcowski asked him to "imagine" B.M.'s location, defendant's statement was not based in reality and thus was analogous to a statement made during a dream.  Such a dream statement is inadmissible as an admission because it lacks trustworthiness.  
People v. Kidd
, 147 Ill. 2d 510, 538 (1992).  However, though defendant was asked to "imagine," the question was whether he was actually imagining, and that was a question for the jury.  Because the statement was so consistent with the other facts of the case, the jury was permitted to infer that defendant was relating personal knowledge, rather than engaging in mere speculation.  That is why the trial court properly deemed the statement an admission.

E. Young's Testimony

Fifth, defendant argues that the court erred in barring Young's testimony.  The admission of expert testimony is within the trial court's discretion, and we may reverse the court's ruling only if the court abused its discretion.  
People v. Howard
, 305 Ill. App. 3d 300, 307 (1999).

Preliminarily, defendant asserts that the court erroneously determined that Young was unqualified to testify because he was a coroner, not a forensic pathologist.  However, though the court did note that Young was not a forensic pathologist, it expressly stated that it was barring Young's testimony because it would be cumulative of Hall's.  Thus, Young's qualifications had nothing to do with the court's ultimate ruling, and we need not address defendant's contention.

Defendant further asserts that Young's testimony would not have been cumulative of Hall's.  Defendant notes that, in his reports, Young not only adopted Hall's entomological opinion but also stated his own opinions on such matters as the cause of B.M.'s death.  However, after he submitted those reports, defense counsel told the court that Young's testimony would be limited to his agreement with Hall's assessment of the new information that Hall had obtained.  Thus, counsel virtually conceded that Young's testimony would be cumulative, and the court properly excluded it as such.

Defendant responds that, though the testimony may have been cumulative, the court still erred in excluding it, as even cumulative evidence should be excluded "only if time considerations substantially outweigh the incremental probative value of the proffered evidence."  M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 192 (7
th ed. 1999).  Defendant contends that, because the time concerns were minimal, "defense counsel should have been permitted to use [Young's] testimony to pull together and clarify the defense theory, even if what the other defense experts had offered was repeated to a degree."  Again, however, defense counsel did not express an intent to use Young for such broad purposes.  Instead, counsel told the court that Young would simply express his agreement with Hall's entomological opinion.  On these facts, we cannot determine that the court abused its discretion in barring Young's testimony.

F. Jury Instructions

Sixth, defendant argues that the jury instructions were defective because they did not include the mental state required to commit predatory criminal sexual assault of a child.  He concedes that he waived this issue by failing to raise it precisely at trial and by failing to tender alternative instructions, but he notes correctly that we may consider his claim if the interests of justice so require.  
People v. Reddick
, 123 Ill. 2d 184, 198 (1988); 177 Ill. 2d R. 451(c).  Because this case is closely balanced, we choose to consider the issue.  See 
Reddick
, 123 Ill. 2d at 198.

As it is defined in section 12--14.1(a)(1) of the Code, a predatory criminal sexual assault of a child requires an act of "sexual penetration."  720 ILCS 5/12--14.1(a)(1) (West 1996).  However, section 12--14.1(a)(1) does not prescribe a requisite mental state, nor does section 12--12(f) of the Code, which defines "sexual penetration."  720 ILCS 5/12--12(f) (West 1996).  In 
People v. Terrell
, 132 Ill. 2d 178, 209 (1989), the supreme court filled that gap by determining that "a mental state of either intent or knowledge implicitly is required for sexual penetration to occur
."  Nevertheless, in 
People v. Franzen
, 251 Ill. App. 3d 813, 830-31 (1993), we held that 
Terrell
 did not require that the jury be instructed on that implied mental state.  In so holding, we followed several appellate court cases, most notably 
People v. Burton
, 201 Ill. App. 3d 116, 122 (1990).

Defendant acknowledges 
Burton
 and 
Franzen
, but he adopts the view of the drafters of the Illinois Pattern Jury Instructions.  The current instructions on the definition and issues of predatory criminal sexual assault of a child include the alternative mental states of intent, knowledge, and recklessness.
(footnote: 1)  Illinois Pattern Jury Instructions, Criminal, Nos. 11.103, 11.104 (4
th ed. 2000) (hereinafter IPI Criminal 4
th).  The drafters noted 
Burton
 but deemed it abrogated by 
People v. Anderson
, 148 Ill. 2d 15, 24 (1992), where the supreme court determined that, though a requisite mental state may be implied, the State nevertheless must prove it.  IPI Criminal 4
th No. 11.103, Committee Note, at 679-80.  
Here, defendant urges us to apply the same logic and overrule 
Franzen
.  We are compelled to decline.

In 
People v. Simms
, 192 Ill. 2d 348, 375-76 (2000), the supreme court confirmed its agreement with 
Burton
 and 
Franzen
.  Thus, despite 
Anderson
, we conclude that 
Burton
 and 
Franzen
 are sound, and we reject defendant's claim that the jury instructions were defective.

G. Double Enhancement

Defendant was convicted of felony murder predicated on predatory criminal sexual assault of a child, an element of which was that B.M. was under the age of 13.  720 ILCS 5/12--14.1(a)(1) (West 1996).  Then, pursuant to section 5--5--3.2(b)(4)(i) of the Unified Code of Corrections (730 ILCS 5/5--5--3.2(b)(4)(i) (West 1996)), the trial court imposed an extended-term sentence based on the fact that B.M. was under the age of 12.  Thus, defendant contends that his extended-term sentence is invalid because the fact that exposed him to that sentence, B.M.'s age, was also an element of his predicate offense.  This is an issue of law, and our review is 
de novo
.  See 
People v. Hopkins
, 201 Ill. 2d 26, 36 (2002).

In 
People v. Ferguson
, 132 Ill. 2d 86 (1989), a defendant was convicted of aggravated criminal sexual assault for committing an act of sexual penetration on a child under the age of 13.  The trial court imposed an extended-term sentence pursuant to what is now section 5--5--3.2(b)(4)(i).  The supreme court stated that "a factor implicit in the offense *** cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish that result."  
Ferguson
, 132 Ill. 2d at 97.  The court noted that the most recent version of section 5--5--3.2 expressed that an extended-term sentence could be imposed on a defendant convicted of an aggravated criminal sexual assault against a minor.  However, that provision was not in the version applicable to the defendant.  Thus, the court deemed the sentence invalid and remanded the cause for resentencing, as the victim's age was the sole basis for the extended term.

In 
People v. Bennett
, 222 Ill. App. 3d 188 (1991), we applied 
Ferguson
 in a felony-murder context.  The defendant was convicted of felony murder predicated on aggravated battery, an element of which was that the victim was at least 60 years old.  We determined that, because the victim's age had elevated the underlying offense from battery to aggravated battery, the trial court erred in using the victim's age as an aggravating factor in imposing its sentence for felony murder.

The State asserts that 
Bennett
 is distinguishable and that, on these facts, 
Ferguson
 does not apply.  The State's proffered  distinction is that, in 
Bennett
, "the victim's age was used to enhance simple battery [a misdemeanor] to the felony offense of aggravated battery, creating the underlying felony in the first instance."  Here, however, the same is true.

In this case, defendant was charged with the underlying felony of predatory criminal sexual assault of a child.  Because B.M.'s age was an element of that offense, that factor obviously was essential to establish "the underlying felony in the first instance."  Without that factor, there was no underlying felony, and defendant would not have been convicted of felony murder.  Thus, 
Bennett
 controls.

In sum, as an element of the predicate offense, B.M.'s age exposed defendant to a sentence for felony murder, 20 to 60 years' imprisonment.  730 ILCS 5/5--8--1(a)(1) (West 1996).  Then, B.M.'s age exposed defendant to an extended-term sentence for felony murder, 60 to 100 years' imprisonment.  730 ILCS 5/5--8--2(a)(1) (West 1996).  This is the very definition of a double enhancement.  We observe that the current version of section 5--5--3.2 expresses that an extended-term sentence may be imposed on a defendant convicted of predatory criminal sexual assault of a child.  730 ILCS 5/5--5--3.2(c) (West 2000).  However, as in 
Ferguson
, that provision was not in the version applicable to defendant.  See 730 ILCS 5/5--5--3.2(c) (West 1996); 
People v. Bosley
, 197 Ill. App. 3d 215, 220 (1990) (defendant is entitled to be sentenced under the law as it stood when he committed the crime).  Thus, in accordance with 
Ferguson
 and 
Bennett
, defendant's extended-term sentence is invalid.

Because the trial court relied solely on B.M.'s age in imposing its extended-term sentence, we remand the cause for resentencing.  See 
Ferguson
, 132 Ill. 2d at 99-100.  Furthermore, because defendant will be resentenced, we need not address his final contention that the court abused its discretion in imposing its 75-year sentence.

III. YOUNG'S APPEAL

In contesting the trial court's award of fees, Young first argues that the court violated defendant's due process right to "a fair opportunity to present his defense."  
Ake v. Oklahoma
, 470 U.S. 68, 76, 84 L. Ed. 2d 53, 61, 105 S. Ct. 1087, 1092 (1985).  However, it is well settled that one has no standing to assert another's constitutional rights.  See 
People v. Govea
, 299 Ill. App. 3d 76, 84 (1998).  In any event, Young's claim is disingenuous.  Although he submits that defendant's trial was unfair, he does not seek a new trial.  Rather, he seeks only a greater award of fees.  Thus, Young is not actually asserting defendant's right to due process of law; he is asserting only his own right to compensation for his services.

Young next argues, more appropriately, that the court abused its discretion in awarding him only $3,000 in fees.  See 
People v. Fowler
, 298 Ill. App. 3d 706, 710 (1998) (fee award is discretionary).  Young asserts that, though the court stated that it had "some disagreement with the number of hours that would be reasonable," it did not identify that disagreement.  Young concludes that the court erred in reducing his fees "without providing a basis for the ruling."

Young's contention is waived.  He claims that the court erred in failing to identify the basis for its ruling, but he never asked the court to provide that basis.  If he wanted to know the nature of the court's disagreement with his request, all he had to do was ask, either at the time of the ruling or in a motion for reconsideration.  Instead of doing so, he acquiesced in the court's ruling, and only now on appeal does he raise his objection.  The objection is waived, and we will not address it.  See 
People v. Crossley
, 236 Ill. App. 3d 207, 217 (1992) ("Where a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby"); 
cf.
 
People v. Hicks
, 101 Ill. 2d 366, 374 (1984) (although statute required statement of reasons for sentence, defendant waived requirement by failing to request statement).

IV. CONCLUSION

For these reasons, defendant's conviction and Young's fee award are affirmed.  Defendant's sentence is reversed, and the cause is remanded for resentencing.

Affirmed in part and reversed in part; cause remanded.

O'MALLEY and GROMETER, JJ., concur.

FOOTNOTES
1: As it has been noted, however, 
Terrell
 provides that recklessness "is not an option for an instruction as to the mental state required for this offense and should not be used, despite its perhaps confusing appearance" in these instructions.  
People v. James
, 331 Ill. App. 3d 1064, 1072 (2002) (Appleton, J., specially concurring).